IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 112,429

VERNON A. BURNETTE and GAIL BURNETTE, as the Heirs-at-Law of VERNON "JOEL"
BURNETTE, Deceased, and VERNON A. BURNETTE, as the Personal Representative of the
Estate of VERNON "JOEL" BURNETTE, Deceased,
*Appellees*,

v.

KIMBER L. EUBANKS, M.D.,
and PAINCARE, P.A.,
*Appellants.*

SYLLABUS BY THE COURT

1.

To recover damages on a medical malpractice theory a plaintiff must show: (i) the health care provider owed the patient a duty of care, which required the provider to meet or exceed a certain standard of care to protect the patient from injury; (ii) the provider breached that duty or deviated from the standard of care; (iii) the patient was injured; and (iv) the injury proximately resulted from the health care provider's breach of the standard of care.

2.

Proximate cause is the cause that in a natural and continuous sequence, unbroken by any superseding cause, both produced the injury and was necessary for the injury. The injury must be the natural and probable consequence of the wrongful act. Individuals are not responsible for all possible consequences arising from their negligence—just those that are probable according to ordinary and usual experience.

1

3.

An event may have more than one but-for cause. Any perceived distinction between the phrases "causing an event" and "contributing to an event" is a distinction without a difference. In other words, an act of negligence that contributes to an event must, of necessity, have at least a part in causing the event.

4.

The purpose in awarding damages is to make a party whole by restoring that party to the position the party was in prior to the injury.

5.

To warrant recovery for damages, there must be some reasonable basis for computation to enable the trier of fact to arrive at an estimate of the amount of the loss.

6.

An item identified as an economic loss must be capable of being valued using either expert testimony or the jury's common-sense understanding about what an item of actual loss costs in the marketplace.

7.

Economic loss in a wrongful death case should be equivalent to those economic benefits or compensation that reasonably could have been expected to have resulted from the continued life of the deceased.

Review of the judgment of the Court of Appeals in 52 Kan. App. 2d 751, 379 P.3d 372 (2016). Appeal from Johnson District Court; PAUL C. GURNEY, judge. Opinion filed August 24, 2018. Judgment of the Court of Appeals affirming the district court is affirmed in part and reversed in part on the issues subject to review. Judgment of the district court is affirmed in part and reversed in part on the issues subject to review, and the case is remanded with directions.

*Steven C. Day*, of Woodard, Hernandez, Roth & Day, LLC, of Wichita, argued the cause, and *Christopher S. Cole*, of the same firm, and *Bruce Keplinger* and *Christopher Lucas*, of Norris & Keplinger, LLC, of Overland Park, were with him on the briefs for appellants.

*Michael W. Blanton*, of Blanton Law Firm, of Evergreen, Colorado, argued the cause, and *Scott E. Nutter*, *John M. Parisi,* and *Daniel A. Singer*, of Shamberg, Johnson & Bergman, Chartered, of Kansas City, Missouri, were with him on the briefs for appellees.

The opinion of the court was delivered by

BILES, J.: Kimber L. Eubanks, M.D., and PainCARE, P.A., appeal from a jury verdict finding them liable for medical malpractice after a patient committed suicide. The lawsuit alleges Vernon "Joel" Burnette contracted bacterial meningitis from lumbar epidural steroid injections administered through an infected lump in 2009. Joel developed arachnoiditis, a severe pain disorder caused by inflammation of a membrane protecting spinal cord nerves. This pain led Joel to suicide in 2013. On appeal, defendants challenge the causal link between their medical treatment and the suicide. They also contest $550,000 in wrongful death economic damages awarded to Joel's parents.

Defendants argue: (1) the jury instructions were wrong because they did not expressly require their medical malpractice to be a "but-for" cause of Joel's suicide; (2) the expert testimony was legally insufficient to establish their negligence caused Joel's suicide; and (3) the trial court improperly permitted the jury to consider as economic damages the parent's claim for "[l]oss of attention, care, and loss of a complete family," rather than considering those losses noneconomic, which would subject them to the statutory cap under K.S.A. 60-1903. A Court of Appeals panel affirmed. *Burnette v. Eubanks*, 52 Kan. App. 2d 751, 779, 379 P.3d 372 (2016).

We hold the jury instructions on causation were legally and factually appropriate, so there was no error. And based on the reasoning used to resolve the jury instruction causation issue, we hold the expert testimony was legally sufficient because it described the causal link between defendants' negligence and Joel's suicide in harmony with those instructions.

We reverse the $550,000 awarded as economic damages for "[l]oss of attention, care, and loss of a complete family." The evidence supporting these losses impermissibly distorted the distinction between economic and noneconomic damages. Economic losses possess a tangible quality for which a plaintiff is entitled to the jury's valuation essentially as replacement for the loss. See *McCart v. Muir*, 230 Kan. 618, 626, 641 P.2d 384 (1982) (economic losses are the "loss of money or of something by which money or something of money value may be acquired"). And while each case has nuanced circumstances, an item identified as an economic loss must be capable of being valued using either expert testimony or the jury's common-sense understanding about what an item of actual loss costs in the marketplace. See *Wentling v. Medical Anesthesia Services*, 237 Kan. 503, 514-15, 701 P.2d 939 (1985). The evidence failed this established standard.

We affirm the jury's verdict on the causation issues, but reverse and vacate the disputed $550,000 monetary award. We remand the case to the district court for entry of judgment consistent with this decision.

FACTUAL AND PROCEDURAL BACKGROUND

Before his death, Joel sued Eubanks, Daniel Bruning, M.D., and their clinic, PainCARE, P.A., alleging negligence in administering epidural steroid injections for back pain. Joel claimed he told the clinic's nursing staff and Eubanks about a painful lump on

4

his back, but Eubanks dismissed the concern and gave him an injection through the infected lump—failing to diagnose and medically treat his spinal epidural abscess. From this, Joel claimed he developed spinal meningitis, significant permanent nerve damage, and arachnoiditis. About four years after the injection, Joel committed suicide.

Joel left his parents a note explaining he "couldn't live one more day with this pain." He wrote, "I tried. So damn hard. I tried. For three long years I tried. And now, I'm tired. So tired. Tired of the pain. Tired of the frustration. Tired of failing. Tired. So very, very, tired."

Joel's parents, Vernon and Gail Burnette, filed a wrongful death claim against Eubanks and PainCARE based on the new cause of action arising from the suicide. They continued with Joel's original lawsuit as a "survival" action on behalf of his estate. See K.S.A. 60-1801 (cause of action for personal injury by wrongful act or omission survives death of person entitled to maintain claim). The district court consolidated the lawsuits. A jury found Eubanks and PainCARE at fault for Joel's injuries and death.

On the personal injury claim, the jury awarded Joel's estate $2,060,317.84, including $1,460,000 in noneconomic damages. Those noneconomic damages were reduced to $250,000 by court order. See K.S.A. 60-19a02 (statutory cap for noneconomic losses in personal injury actions). On the wrongful death claim, the jury awarded Joel's parents $820,062. This included funeral expenses and an additional $550,000 as economic damages, which were not subject to a noneconomic damages cap in wrongful death actions. See K.S.A. 60-1903. The $550,000 economic award was itemized on the verdict form as "[l]oss of attention, care, and loss of a complete family." Defendants appealed. A Court of Appeals panel affirmed. *Burnette,* 52 Kan. App. 2d at 779.

5

Defendants timely filed a petition for review with this court, which we granted. Jurisdiction is proper. See K.S.A. 20-3018(b) (providing for petitions for review of Court of Appeals decisions); K.S.A. 60-2101(b) (Supreme Court has jurisdiction to review Court of Appeals decisions upon petition for review).

THE CAUSATION INSTRUCTIONS

We consider first whether the jury instructions improperly diluted the legally necessary causal link between defendants' conduct and Joel's suicide. The panel succinctly described the chain of events: "But for [defendants'] negligence, it was foreseeable that Joel would have become infected. Then, due to infection, Joel contracted arachnoiditis and because of the arachnoiditis, Joel committed suicide." 52 Kan. App. 2d at 762.

To recover damages on a medical malpractice theory, a plaintiff must show:

"(1) [T]he health care provider owed the patient a duty of care, which required that the provider meet or exceed a certain standard of care to protect the patient from injury; (2) the provider breached that duty or deviated from the standard of care; (3) the patient was injured; and (4) the injury proximately resulted from the health care provider's breach of the standard of care. *Miller v. Johnson*, 295 Kan. 636, Syl. ¶ 15, 289 P.3d 1098 (2012)." *Foster v. Klaumann*, 296 Kan. 295, 302, 294 P.3d 223 (2013).

Our attention is on that fourth element. Proximate cause is the cause that "'"in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act."'" *Yount v. Deibert*, 282 Kan. 619, 624-25, 147 P.3d 1065 (2006). Individuals are not responsible for all *possible*

6

consequences arising from their negligence—just those that are *probable* according to ordinary and usual experience. *Hale v. Brown*, 287 Kan. 320, 322, 197 P.3d 438 (2008).

Defendants argue they can be liable only if Joel's suicide would not have occurred without their negligent conduct, i.e., but-for causation. They claim the jury instructions failed to ensure this.

From defendants' perspective, the culprit is Jury Instruction No. 11, which stated: "A party is at fault when he or she is negligent and that negligence caused *or contributed to* the event which brought about the claim for damages." (Emphasis added.) Defendants contend the italicized language permitted the jury to find liability without making the legally required causal connection between their negligence and Joel's suicide nearly four years later. To resolve this, we must decide whether an actor's conduct that "contributes to" an event that brings about the claim is the same as a "but-for" cause of a plaintiff's injuries.

We consider jury instructions together and read them as a whole. *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 437, 228 P.3d 1048 (2010). And as discussed below, when taken as a whole, the instructions correctly supply the cause-in-fact requirement under Kansas law. Instruction No. 11, which is the centerpiece for this question, permitted the jury to find a defendant at fault only if that defendant's negligence "caused or contributed to the event *which brought about the claim for damages*." (Emphasis added.) If the jury believed Joel's suicide would have occurred without a defendant's negligence, i.e., the negligence did not have a share in producing Joel's death, the instructions required the jury to find no fault as to that defendant. In other words, to impose liability for Joel's suicide under Instruction No. 11, the jury would have to have found a defendant's negligence was a "but-for" cause of his death. This, coupled with the

7

other instructions, correctly stated the law and appropriately communicated to the jury the test to be applied.

*Additional Background*

The district court provided two other relevant instructions. Instruction No. 12 stated:

"When answering questions on the verdict form, you should keep the following things in mind:

"1. *Your first obligation is to determine if any defendant is at fault*.

"2. *If you decide that any defendant is at fault*, you must then assign a percentage of fault to each defendant you find to be at fault.

"3. For a defendant not at fault, show 0% on the verdict form.

"4. If you find any defendant at fault, show 1% to 100% on the verdict form for that defendant.

"5. If one or more defendants are assigned fault, the total of all fault must be 100%.

"You may assign fault to:

"Kimber L. Eubanks, M.D.

"PainCARE, P.A." (Emphases added.)

Instruction No. 16 stated: "The plaintiffs claim that Joel Burnette was injured, sustained damages, and died *due to the defendants' fault* in one or more of the following respects." (Emphasis added.) It then identified the negligence allegations against Eubanks and PainCARE. It then told the jury: "The plaintiffs have the burden to prove that one or more of their claims are more probably true than not true. It is not necessary that each of you agree upon a specific claim."

At trial, defendants objected to Instruction No. 11 claiming it incorrectly stated causation under the wrongful death statute, which authorizes an action for damages resulting from a person's death "*caused by* the wrongful act or omission of another." (Emphasis added.) K.S.A. 60-1901. They renewed this objection when requesting a new trial. The district court conceded Instruction No. 11 "doesn't square perfectly" with the wrongful death statute but concluded it was legally appropriate anyway, relying on caselaw in which the same instruction was used in comparative-fault wrongful death claims.

In the Court of Appeals, defendants continued to assert Instruction No. 11 conflicted with the wrongful death statute. Defendants argued the words "contributed to" permitted the jury to hold them liable if it found their negligence had just a small part in causing the accident but without finding Joel's suicide would not have occurred "but-for" that negligence. They further claimed the phrasing "caused or contributed to" aggravated their concern because the word "or" operated as a conjunctive that made "caused" irrelevant in the jury's deliberative process. Defendants would have stricken "or contributed to" from Instruction No. 11. The panel disagreed. *Burnette*, 52 Kan. App. 2d at 756.

The panel noted plaintiffs proved both causation in fact and legal causation. It said, "The ultimate question the jury had to decide . . . was whether Joel's death was a

9

result of [defendants' negligence]"; and since plaintiffs alleged two parties were at fault, "[c]ertainly . . . within the context of the jury's assessment of comparative fault, the use of the word 'contributed' is appropriate." 52 Kan. App. 2d at 762. The panel held "a contributing cause is a cause as the term is used in the wrongful death statute," so if a defendant's "negligence contributes to the cause of death and it is foreseeable, then [the defendant] can be held liable for that death in proportion to [the defendant's] percentage of fault." 52 Kan. App. 2d at 759. The panel further reasoned comparative fault principles applied in a wrongful death action because the comparative negligence statute provides that a party's contributory negligence "'does not bar that party or its legal representative from recovering damages for negligence resulting in death . . . if that party's negligence was less than the causal negligence of the party or parties against whom a claim is made.'" 52 Kan. App. 2d at 751 (quoting K.S.A. 2015 Supp. 60-258a[a] and citing cases applying comparative fault in wrongful death cases).

Finally, the panel concluded defendants' interpretation of the wrongful death statute was too restrictive because it would preclude recovery "when there are complex facts and several different forces are engaged in an incident that results in death." 52 Kan. App. 2d at 758. It held the defendants' proposed instruction was legally inappropriate.

*Standard of Review*

"'For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error

10

was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011) . . . .' [Citation omitted.]" *Foster*, 296 Kan. at 301-02.

*Discussion*

There are two preliminary points. First, although defendants' instruction issue and our holding apply equally to the survival action, defendants frame the question as a challenge limited to the wrongful death claim. Presumably this is to bring focus on the wrongful death statute's "*caused by* the wrongful act or omission of another" language. (Emphasis added.) K.S.A. 60-1901(a). Second, defendants do not question the panel's conclusion that comparative fault applies in wrongful death actions, nor do they suggest the causal requirement in wrongful death actions is more stringent than other negligence claims. We mention this because the panel needlessly explored whether comparative fault applies in wrongful death suits. 52 Kan. App. 2d at 758-59. As a practical matter, that was a distraction because defendants did not dispute it.

We must focus on the second step in the jury instruction analysis, i.e., whether Instruction No. 11 was legally appropriate. An instruction "'must always fairly and accurately state the applicable law, and an instruction that does not do so would be legally infirm.'" *State v. McDaniel*, 306 Kan. 595, 615, 395 P.3d 429 (2017) (quoting *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 [2012]). The instruction asked the jury to determine whether Joel's suicide proximately resulted from the alleged breach of the standard of care by these two healthcare providers. See *Foster*, 296 Kan. at 302 (proximate cause is one of the four elements plaintiff must show in order to establish medical malpractice).

11

In Kansas,

"[t]here are two components of proximate cause: causation in fact and legal causation. To establish causation in fact, a plaintiff must prove a cause-and-effect relationship between a defendant's conduct and the plaintiff's loss by presenting sufficient evidence from which a jury can conclude that more likely than not, but for defendant's conduct, the plaintiff's injuries would not have occurred. To prove legal causation, the plaintiff must show it was foreseeable that the defendant's conduct might create a risk of harm to the victim and that the result of that conduct and contributing causes was foreseeable." *Drouhard-Nordhus v. Rosenquist*, 301 Kan. 618, 623, 345 P.3d 281 (2015).

Proximate cause is ordinarily a factual question to be resolved by the trier of fact. *Cullip v. Domann*, 266 Kan. 550, 972 P.2d 776 (1999). But see *Hale*, 287 Kan. at 324 (noting when "all the evidence on which a party relies is undisputed and susceptible of only one inference, the question of proximate cause becomes one of law").

Under the comparative fault statute,

"(a) *Effect of contributory negligence*. The contributory negligence of a party in a civil action does not bar that party or its legal representative from recovering damages for negligence resulting in death, personal injury, property damage or economic loss, if that party's negligence was less than *the causal negligence* of the party or parties against whom a claim is made, but the award of damages to that party must be reduced in proportion to the amount of negligence attributed to that party. If a party claims damages for a decedent's wrongful death, the negligence of the decedent, if any, must be imputed to that party.

. . . .

"(d) *Apportioning liability*. When the comparative negligence of the parties is an issue and recovery is permitted against more than one party, each party is liable for that

12

portion of the total dollar amount awarded as damages to a claimant in the proportion that the amount of that party's *causal negligence* bears to the amount of the *causal negligence* attributed to all parties against whom recovery is permitted." (Emphases added.) K.S.A. 2017 Supp. 60-258a.

In comparative fault cases, the PIK Committee recommends instructing a jury:

"You must decide this case by comparing the fault of the parties. In doing so, you will need to know the meaning of the terms 'negligence' and 'fault.'

"Negligence is the lack of reasonable care. It is the failure of a person to do something that a reasonable person would do, or it is doing something that a reasonable person would not do, under the same circumstances.

. . . .

"*A party is at fault when he or she is negligent and that negligence caused or contributed to the event which brought about the claim(s) for damages.*

"I am required to reduce the amount of damages you may find for any party by the percentage of fault, if any, that you find is attributable to the party.

"A party will be able to recover damages only if that party's fault is less than 50 percent of the total fault assigned. A party will not be able to recover damages, however, if that party's fault is 50 percent or more." (Emphasis added.) PIK Civ. 4th 105.01 (2010 Supp.).

The italicized language was covered by Instruction No. 11.

The pattern instruction's definition of "fault" first appeared in Kansas caselaw in 1978. It then repeated in numerous decisions from this court. See *Miles v. West*, 224 Kan.

13

284, 289, 580 P.2d 876 (1978) (holding no error in automobile negligence case for failing to instruct on proximate cause regarding defendant's intoxication when fault instruction made clear the intoxication "*had to cause or contribute to* the accident before the jury could assess liability on that basis" [emphasis added]); see, e.g., *Sharples v. Roberts*, 249 Kan. 286, 295, 816 P.2d 390 (1991) ("The plaintiff bears the burden of proving the necessary causation and normally in medical malpractice cases, this court has described the duty in general terms, merely stating there must be a causal connection between the negligent act and the injury or that *the act caused or contributed to* the injury." [Emphasis added.]); *Allman v. Holleman*, 233 Kan. 781, Syl. ¶ 4, 667 P.2d 296 (1983) ("A party is at fault when he is negligent and his *negligence caused or contributed to* the event which brought about the injury or damages for which the claim is made." [Emphasis added.]).

The PIK Committee explains that the court in *Reynolds v. Kansas Dept. of Transportation*, 273 Kan. 261, 269, 43 P.3d 799 (2002), approved PIK's definition of fault. PIK Civ. 4th 105.01 Comment. *Reynolds* contains this brief statement: "[T]he jury was correctly instructed that '[a] party is at fault when he or she is negligent and that negligence *caused or contributed to* the event which brought about the injury or damages for which a claim is made.'" (Emphasis added.) 273 Kan. at 269. But *Reynolds* did not analyze whether this correctly conveyed the cause-in-fact component. See 273 Kan. at 269. We consider that next.

Our "proximate cause" requirement, which encompasses both causation-in-fact and legal causation, is equivalent to the "legal cause" concept from the Restatement (Second) of Torts § 431 (1965). *Donnini v. Ouano*, 15 Kan. App. 2d 517, 520, 810 P.2d 1163 (1991); see also *Roberson v. Counselman*, 235 Kan. 1006, 1012, 686 P.2d 149 (1984), *modified on other grounds by Delany v. Cade*, 255 Kan. 199, 873 P.2d 175 (1994); Restatement (Third) of Torts: Liability for Physical Harm § 26, comment a

14

(2010) (noting Restatement Second employed "'legal cause' to encompass two distinct inquiries: factual cause and proximate cause").

Under the Restatement, an actor's conduct is "a legal cause of harm to another if (a) [the actor's] conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which [the actor's] negligence has resulted in the harm." Restatement (Second) of Torts § 431 (1965). And consistent with Kansas' cause-in-fact requirement, under the Restatement (Second) of Torts § 432 (1965),

> "(1) Except as stated in Subsection (2), the actor's negligent conduct is not a substantial factor in bringing about harm to another *if the harm would have been sustained even if the actor had not been negligent*.

> "(2) If two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, *the actor's negligence may be found to be a substantial factor in bringing it about*." (Emphases added.)

Similar to how Kansas treats "proximate cause," the Restatement (Third) of Torts refines in a consistent way the Restatement (Second) concept by abandoning the phrase "legal cause" and more pointedly describing causation as two separate components: "Factual Cause" and "Scope of Liability (Proximate Cause)." Restatement (Third) of Torts, Chapters 5 & 6 (2010). And as with the cause-in-fact component of "legal cause" under the Restatement (Second), factual cause under the Restatement (Third) requires but-for causation—except when there are multiple causes, each sufficient to cause the harm. Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 26, comment c (2010). Describing factual causation, the Restatement (Third) explains:

15

"An actor's tortious conduct need only be a factual cause of the other's harm. The existence of other causes of the harm does not affect whether specified tortious conduct was a necessary condition for the harm to occur. Those other causes may be innocent or tortious, known or unknown, influenced by the tortious conduct or independent of it, *but so long as the harm would not have occurred absent the tortious conduct, the tortious conduct is a factual cause*. Recognition of multiple causes does not require modifying or abandoning the but-for standard in this Section. Tortious conduct by an actor need be only one of the causes of another's harm. *When there are multiple sufficient causes . . . , each of which is sufficient to cause the plaintiff's harm, supplementation of the but-for standard is appropriate*. [Citation omitted.]

"A useful model for understanding factual causation is to conceive of a set made up of each of the necessary conditions for the plaintiff's harm. Absent any one of the elements of the set, the plaintiff's harm would not have occurred. Thus, there will always be multiple (some say, infinite) factual causes of a harm, although most will not be of significance for tort law and many will be unidentified. *That there are a large number of causes of an event does not mean that everything is a cause of an event. The vast majority of acts, omissions, and other factors play no role in causing any discrete event.*

"This causal-set model does not imply any chronological relationship among the causal elements involved, although all causes must precede the plaintiff's harm. . . . Nor does this model imply any relationship among the causal elements; causal elements may operate independently, as when a property owner neglects a patch of ice on a sidewalk and a careless pedestrian fails to notice the condition, producing a fall." (Emphases added.) Restatement (Third) of Torts: Liability for Physical Harm § 26, comment c (2010).

In *Hale*, the court rejected an effort to "jettison the traditional concept of proximate cause and replace it with a requirement that a plaintiff be able to prove that injury resulting from the defendant's conduct was foreseeable and that the defendant's conduct contributed to the injury." 287 Kan. at 323. In other words, the plaintiff contended that "any contribution to the plaintiff's injuries should be left for the jury to

16

calculate as a percentage of overall fault." 287 Kan. at 323-24. The court reasoned that "such an expansive causation element would greatly increase the number of potential defendants in negligence actions and the concomitant costs of litigation," and would conflict with statutes the court viewed as "recogniz[ing] proximate cause as an element of negligence actions." 287 Kan. at 323.

The issue in *Hale* was not causation in fact, but legal cause. The *Hale* court upheld a district court's decision granting defendants' summary dismissal from a comparative fault lawsuit based on plaintiff's failure to establish proximate cause. The defendant motorist was in a single-car accident. Plaintiff slowed her vehicle at the accident scene, and another motorist ran into her. The court held the defendant motorist did not proximately cause the collision involving plaintiff because the passage of time and the third party's intervening negligence broke the causal connection between the defendant motorist's actions and plaintiff's injuries. 287 Kan. at 324; cf. Restatement (Second) of Torts § 433 (1965) (listing considerations important when determining if conduct is a "substantial factor" in bringing about harm, including lapse of time and whether an actor's conduct was harmless unless acted on by other forces outside actor's responsibility).

*Hale* speaks to the legal cause component of the causation element proposed and rejected in that case. But a second case addresses the piece not discussed in *Hale*—the factual cause component. In *Lollis v. Superior Sales Co., Inc.*, 224 Kan. 251, 252, 580 P.2d 423 (1978), the court held a police officer who investigated an automobile accident could not testify that plaintiff was speeding and following too closely, or that the defendant driver made no "contributing actions." In doing so, the court applied the rule that expert testimony is inadmissible when lay jurors' normal experience and qualifications would enable them to draw proper conclusions without expert opinion. 224 Kan. at 261. It reasoned that fault in causing the accident was within common knowledge. And as to this causation issue, the court explained:

17

"[*T*]*he distinction between 'causing an accident' and 'contributing to an accident' is a distinction without a difference. . . . An act of negligence which contributes to an accident must, of necessity, have at least a part in causing the accident.* We note that in Webster's Third New International Dictionary 496 (3rd ed.), the word 'contribute' is defined in a causal sense as 'to have a share in any act or effect.' Likewise, the word 'contributing' is defined as something that 'has a part in producing an effect.' We, therefore, hold that in an automobile negligence case, an expert witness, whether an investigating police officer or another expert, may not state his opinion as to what actions of the parties, if any, contributed to the collision or as to who was at fault in causing the collision." 224 Kan. at 263.

Similarly, in *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 435, 228 P.3d 1048 (2010), the court indicated a cause that "contributed to causing" a subsequent event is a but-for cause of that event. The court held it was error to instruct that a doctor's negligence in using a particular medical device could cut off liability for earlier health care providers whose negligence created the conditions necessitating the doctor's intervention with that device. 290 Kan. at 436-37.

The instruction was error, the court explained, because expert testimony established a cause-in-fact relationship between the earlier medical care and the decedent's death from aspiration, and because no evidence established the later doctor's intervention was "so extraordinary or unusual as to break the causal connection between" the earlier medical care providers' negligence and the death. 290 Kan. at 415, 435, 437. The event chain was: decedent had an infection the earlier providers failed to properly diagnose and treat; this caused sepsis; the sepsis was treated with fluids; the combination of sepsis and fluid retention led to respiratory distress, which required respiratory care; one treatment method for that care was the device used by the doctor; that device can put

18

pressure on the stomach; and aspiration can result from pressure on a stomach full of fluid.

The court reasoned,

"[A]ccording to [the expert], no single factor . . . caused the aspiration event. Rather, *various causes contributed to causing the aspiration . . . .* In light of the concurring causes, the issue for the jury was whether [the nurse and doctor] committed negligence that was the cause in fact of the need to use some form of respiratory assistance that led to the foreseeable use of the BiPAP mask. If that cause in fact was established, [the expert] connects [the nurse and doctor's] acts or omissions with the other causes of the aspiration event. His testimony thus does not provide evidence on which a reasonable jury could find a superseding, intervening cause." (Emphasis added.) 290 Kan. at 435.

Against this background, Eubanks and PainCARE argue the phrase "contributed to" as a statement of but-for causation allowed plaintiffs too much leeway. They assert all Joel's parents needed to show was that "in some way, no matter how small, [a] defendant's negligence played a part in the outcome." But this is wrong. An event may have multiple but-for causes. Defendants' argument ignores the role "legal causation" plays to cut off liability for those whose causal conduct is too remote for liability to attach. See *Hale*, 287 Kan. at 324.

We hold Instruction No. 11, taken with the other instructions, correctly communicated the cause-in-fact requirement under Kansas law. Instruction No. 11 permitted the jury to find fault only if a defendant's negligence "caused or *contributed to* the event which *brought about* the claim(s) for damages." (Emphases added.) Instruction No. 12 explained how to do that. And Instruction No. 16 told the jury plaintiffs had to prove they were injured "*due to the defendants' fault*." (Emphasis added.) Applying the *Lollis* court's reasoning, the instructions told the jury that to impose liability for Joel's

19

suicide on either defendant, it would have to find defendant's negligence was a but-for cause of his death.

The "caused or contributed to" language in Instruction No. 11 permitted the jury to assign fault only if a defendant's negligence "ha[d] a share in" producing the injury. *Lollis*, 224 Kan. at 263. If the jury believed the injury would have occurred without a defendant's negligence, i.e., the negligence did not have a share in producing the injury, the instructions told the jury to assign no fault to that defendant.

EXPERT TESTIMONY ESTABLISHING THE CAUSAL LINK

Defendants claim they were entitled to judgment as a matter of law on the wrongful death claim because plaintiffs' evidence from expert testimony was insufficient to demonstrate defendants' negligence was a factual cause of Joel's death. This argument ties directly to the previous but-for causation issue. Defendants contend that because both plaintiff experts testified defendants' negligence "contributed to" the event chain, the evidence was fatally lacking in proving but-for causation. Their argument fails for the same reasons we concluded the jury instructions were legally appropriate.

*Additional Background*

Two plaintiff experts gave their opinions about the causal connection between the alleged medical negligence and Joel's death:  Sharleen Clauser, a licensed clinical social worker, and Steve Simon, M.D., a pain management practitioner from Overland Park.

Clauser saw Joel about 50 times for psychotherapy sessions. She believed she was unqualified to make a medical diagnosis but qualified to provide a psychiatric diagnosis. She thought Joel's arachnoiditis contributed to his suicide. By "contributed to" she meant

20

it was her opinion arachnoiditis caused Joel to have bipolar symptoms that contributed to his worsening depression. She said Joel's back pain, specifically his "adhesive arachnoiditis and all of the symptoms with it," contributed to his suicide.

Simon's opinions were to a reasonable degree of medical certainty or probability. He examined Joel in September 2012 and believed he suffered from cauda equina syndrome. Simon said arachnoiditis was scar tissue caused by Joel's meningitis, producing "a thickening of [the] nerves" and causing them to "[clump] together." He explained that "a huge problem in chronic pain . . . is the loss of hope that patients get who have it." Simon described Joel as a patient "controlled by his pain."

Simon agreed that chronic pain "can contribute to depression and suicide." He said depression "is probably the most common symptom after pain" for individuals with chronic pain and explained that "for many patients, when they feel overwhelmed by this type of a situation and they see no way out, unfortunately, sometimes those patients will choose suicide. It's something we recognize in the world of chronic pain. I have to admit that, yes, I've had patients who have done that." Simon agreed that, "Joel's physical pain contributed to his decision to end his life" and "contributed to cause" that decision.

Defendants moved for judgment as a matter of law on both the wrongful death and survival claims. Focusing on the wrongful death, defendants claimed expert medical testimony was required to "link up causation in the suicide claim." Specifically, they argued, Clauser's opinion that the arachnoiditis only contributed to the suicide failed to sufficiently link Joel's death to their negligence. Likewise, they said, Simon only believed pain played a role in Joel's suicide. The court denied the motion.

The court found there was "clearly sufficient evidence to support" Joel's survival claim for damages accruing during his lifetime. It recounted that (1) Clauser said

21

arachnoiditis contributed to the suicide by causing bipolar symptoms and contributing to his depression worsening; (2) Simon mentioned a contributing link between the condition and suicide; and (3) another witness testified people with arachnoiditis occasionally commit suicide. The court said, "I'm going to go back to what [Clauser] testified to. I think . . . there is sufficient linkage to allow this matter to go before the jury." The court relied on *Wozniak v. Lipoff*, 242 Kan. 583, 750 P.2d 971 (1988) (concerning expert medical testimony necessary to create a jury question whether a doctor's negligence caused a patient's suicide by prescription medication overdose).

In revisiting defendants' challenge when deciding the new trial motion, the district court cast the issue as whether there was sufficient evidence to connect Joel's death back to the negligence allegations. The court acknowledged no expert testimony concluded the suicide was "caused by" the alleged negligence, adding: "I don't believe there was the expert testimony . . . tying up that linkage between the condition and the suicide, but as per *Wozniak*, that was not required." The court concluded plaintiffs "clearly established" sufficient evidence allowing the jury to make the determination that the alleged negligence caused significant consequences to Joel. The court explained, "[I]t was not necessarily for the plaintiffs to, through expert testimony, directly tie up that condition with the suicide through testimony that in an expert's opinion that one caused the other."

On appeal, defendants continued to argue the expert testimony did not support a finding that Joel's suicide would not have occurred but for defendants' negligence. They claimed the testimony permitted the jury to base its decision on conjecture. They also argued the district court misread *Wozniak* to create a "suicide exception" to the expert testimony requirement for proving medical malpractice causation.

The panel viewed defendants' arguments about Clauser as a challenge to her testimony's admissibility to prove causation under K.S.A. 65-6319 (defining the

22

permissible scope of licensed social workers' practices). *Burnette*, 52 Kan. App. 2d at 763. The panel concluded her testimony was admissible within the trial court's discretion. 52 Kan. App. 2d at 764. Then, the panel stated it was unnecessary to decide whether medical testimony was required to show Joel's suicide was caused by medical negligence or whether the district court misread *Wozniak* because Simon and Clauser provided the necessary expert testimony. 52 Kan. App. 2d at 765.

*Standard of Review*

K.S.A. 2017 Supp. 60-250(a) provides:

"If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may . . . grant a motion for a judgment as a matter of law against the party on a claim . . . that, under the controlling law, can be maintained . . . only with a favorable finding on that issue."

An appellate court applies the same standard as the trial court when considering a motion for judgment as a matter of law under K.S.A. 2017 Supp. 60-250. The court resolves all facts and inferences reasonably drawn from the evidence in favor of the nonmoving party. If the evidence could lead reasonable minds to different conclusions, the motion must be denied. *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 405, 266 P.3d 516 (2011) (quoting *National Bank of Andover v. Kansas Bankers Surety, Co.*, 290 Kan. 247, 267, 225 P.3d 707 [2010]); see also *Smith v. Kansas Gas Service Co.*, 285 Kan. 33, 40, 169 P.3d 1052 (2007) ("[A] motion for judgment as a matter of law must be denied when evidence exists upon which a jury could properly find a verdict for the nonmoving party."). "'Stated another way, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."'" *Wolfe Electric, Inc.*, 293 Kan. at 405

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 [1986]).

*Discussion*

Defendants argue the panel "effectively excused the requirement of expert testimony to support proximate causation" by upholding the judgment when plaintiffs' experts only testified that "defendants' actions 'contributed' to the adverse outcome." This limited testimony, they continue, was "insufficient to establish but-for causation." But this is simply a revised version of the jury instruction argument rejected above, so the argument is without merit. See *Lollis*, 224 Kan. at 263 (holding opinion that party's action "contributed to" occurrence constitutes opinion on causation because negligence contributing to an event necessarily had at least a part in causing it). Plaintiffs' evidence supported the jury's findings that defendants' negligence caused Joel to develop arachnoiditis.

Clauser and Simon both testified this condition contributed to Joel's suicide. And under our construction of "contributed to," as previously discussed, this expert testimony sufficiently established how the alleged medical negligence produced the suicide, i.e., of necessity, their actions had at least a part in causing it—either as the sole cause or as one cause that combined with others to produce the result. See *Lollis*, 224 Kan. at 263; Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 26, comment c (2010) (harm may have more than one cause, and liability attaches to actor's negligence so long as it is one of the causes); cf. *Sharples*, 249 Kan. at 297 (holding trial court correctly concluded there was insufficient causation evidence in medical malpractice action when testimony did not "establish that the [negligence] probably caused or contributed to plaintiff's [injuries]").

24

While neither Clauser nor Simon expressed their opinions in the language defendants would have us require, i.e., Joel's suicide would not have occurred "but-for" defendants' medical negligence, that phrasing was not required. Their testimony sufficiently established a direct causal link under our caselaw. And since there was expert testimony sufficient to create a jury question on causation, we need not consider Eubanks' argument that the district court erred by concluding as an aside that such testimony may not have even been necessary.

ECONOMIC/NONECONOMIC WRONGFUL DEATH DAMAGES

The purpose for awarding damages is to make a party whole by restoring that party to the position the party was in prior to the injury. *Evenson v. Lilley*, 295 Kan. 43, 46, 282 P.3d 610 (2012). To warrant recovery for damages, there must be some reasonable basis for a computation to enable the trier of fact to arrive at an estimate of the amount of the loss. *Miller v. Johnson*, 295 Kan. 636, 677, 289 P.3d 1098 (2012); *Cerretti v. Flint Hills Rural Electric Co-op Ass'n*, 251 Kan. 347, 360-61, 837 P.2d 330 (1992).

To be sure, money damages in a wrongful death lawsuit are an inadequate substitute for a loved one's loss. See *Borer v. Am. Airlines, Inc*., 19 Cal. 3d 441, 455, 563 P.2d 858 (1977) ("'"Money is a poor substitute for the loss of an only child or the pain resulting from serious injuries."'"); *Theama by Bichler v. City of Kenosha,* 117 Wis. 2d 508, 523, 344 N.W.2d 513 (1984) ("'To say that plaintiffs have been "compensated" for their loss is superficial; in reality they have suffered a loss for which they can never be compensated.'"). But money damages are what our system permits. K.S.A. 60-1903 and 60-1904; *Smith v. Printup*, 254 Kan. 315, 334, 866 P.2d 985 (1993) (wrongful death is a statutory creature; K.S.A. 60-1901 et seq. identifies the specific damages recoverable).

25

The jury awarded Joel's parents $820,062, which included $550,000 as economic damages for past and future "[l]oss of attention, care, and loss of a complete family." On appeal, defendants challenged both the "loss of a complete family" descriptor and the classification of the parents' evidence concerning their losses denoted as economic damages. The panel held the verdict form descriptor "loss of a complete family" was legally inappropriate as an economic loss. *Burnette*, 52 Kan. App. 2d at 769-70. Plaintiffs did not seek review of this ruling, so that much is decided. See *Ullery v. Othick*, 304 Kan. 405, 415, 372 P.3d 1135 (2016). But the panel affirmed the $550,000 award nonetheless. *Burnette*, 52 Kan. App. 2d at 771. The evidence supporting that award is now before us on review.

To resolve defendants' challenge we must consider:  (1) what properly comprises economic damages, as opposed to noneconomic damages; (2) what evidence, if any, supported the $550,000 economic loss award upheld by the panel; and (3) whether clear error requires reversal because the "loss of a complete family" descriptor was erroneously included as an economic damage item. These inquiries overlap.

That said, we emphasize no one questions that Joel's death resulted in heartbreaking loss on many dimensions. But our task is deciding how the evidence offered at trial to support what remains as the "[l]oss of attention [and] care" claim must be classified under existing law. That analysis is not meant to be insensitive, but the necessary legal inquiry no doubt looks that way. See *Morris v. Francisco*, 238 Kan. 71, 77, 708 P.2d 498 (1985) (commending medical malpractice victim's "spirit in the face of multiple physical problems that would have daunted many persons," but noting damages "must be looked at objectively and the proper legal standards applied").

26

Plaintiffs concede there was no "loss of services" claim of the type that are more typically understood as economic damages, like lost wages. Defendants argue before this court that the evidence makes it impossible to differentiate the remaining "[l]oss of attention [and] care" line item, from what should fall under the verdict form's noneconomic damages line item entitled "Loss of Society, loss of comfort, or loss of companionship."

In their appellate briefing, Joel's parents fully describe what evidence they say supported their economic "[l]oss of attention [and] care" damages. We quote this verbatim because it illuminates the controversy and the analytical difficulties when trying to distinguish the economic claim from the noneconomic "Loss of Society, loss of comfort, or loss of companionship" claim:

> "Joel's father, Vernon Burnette, testified that Joel took care of the needs of his family. Joel was extremely close to his parents. Joel engaged in numerous activities with his father including sports, target shooting and fishing. Joel taught his father how to fly-fish. Joel spoke to his parents by phone nearly every day. Joel played board games with his parents. His father testified that even after his health went downhill, Joel still tried to be caring and attentive to the needs of his family. At trial, Joel's father discussed a card that Joel had sent to his parents which showed how caring and attentive Joel was to his parents. Joel's father testified that Joel regularly gave similar notes to his parents.
>
> "Joel's mother, Gail Burnette, testified that Joel regularly went on trips to the zoo with his parents. He also went on trips to the lake with his parents. She testified that Joel was close to his father and engaged in activities with him such as working on cars. In describing her relationship with Joel, Gail described him as her best friend. She testified that Joel helped his parents see the world through the eyes of a younger generation, and that she valued that. She testified that Joel was attentive to the needs of his parents and

27

was a caring son. His mother testified that even after Joel became ill, he still tried to be attentive to his family's needs. Even after he became sick, Joel continued going to movies and similar activities with her, but he found it difficult with his physical condition.

"Joel's sister, Kim Lazano, testified that Joel was close to his father and engaged in many activities with his father. She testified that Joel was also close to his mother and engaged in a variety of activities with her. Joel's girlfriend, Ellen Short, testified that Joel was close to both his parents."

The trial testimony paralleled this description. More pointedly, this is the entire evidentiary basis for the challenged monetary award. And plaintiffs' closing argument on the wrongful death claim carried this forward when counsel told the jury:

"Let's talk about the wrongful death claim, that is even a little bit tougher to talk about. Some parts are; some parts aren't. There will be a line on the verdict form for funeral expenses. We presented the evidence of what those are. And we ask that you include in your verdict an award for funeral expenses, $20,062. There will be two lines in your verdict form that will be for noneconomic loss to Gail and Vernon. Grief, and I can't—my worries can't do justice to what you heard in this courtroom from Gail and Vernon. So just remember back to what they said. Vernon is 64 years old; Gail is 63 years old. If they lived 20 more years, that is 7300 days, 175,200 hours. The sadness they feel is so deep, and it's so overwhelming that it's impossible to describe in words, but it [came] through.

"For noneconomic damages, we ask you to include in your verdict for the past, $50,000 for the years . . . since they've lost Joel. And for the future, for the next 19 years, we ask that you include money in your verdict in the amount of $200,000. $250,000 total, not a penny more, but not a penny less. This [is] a reasonable figure in light of the loss that they sustained.

. . . .

28

"*What really matters, and where the loss is really felt and where the benefits that they expected to receive from Joel will no longer be there, is the loss of a complete family. The loss of Joel's care, the loss of his attention. That came through during the testimony.* And we could have brought you 300 people, everybody who was at the wake to come and tell a story about Joel and how attentive he was to the needs of his parents, how he cared for his parents, and how their family unit was so close and so special. We only brought you a snapshot and it still came through how special that bond is. His note, his note, the last page of his note, 'call these people, mom and dad, they will help you.' To the very end, he's most concerned about mom and dad. And he's caring for mom and dad.

"This is a very close family, they're very loving, they're very supportive of each other. Now that Joel is gone, Mr. Burnette said it's like losing an arm. Every day and every hour, you notice it's not there. Gail lost her best friend. She sees him everywhere, but he's gone. The daily phone calls, the trips to the zoo. It's a special time. They'll live without for the next 19 years. That is real loss, real harm, and it's more important than a medical bill. It's more important than lost wages.

"*If you compensated Gail and Vernon, again, $500 a day for the loss of Joel's care, attention, and loss of a complete family, the number would be [$]3,650,000.* If you compensated him $20 an hour, it would be $3,504,000. If you compensated him $250 a day, it would be $185,000. Ten dollars an hour would be $1,752,000. The medical bills, billed amount in the lost wages, again, [$]600. We know these losses are more important. We know we all value them greater. How much more? Four times, four times as much. If you did that, then the number would be $2,400,000. Three times more important, that would be $1,800,000. *We ask you to . . . include in your verdict for past loss of attention, care, and loss of a complete family, $50,000. And for the next 19 years, when the loss is felt every day, every hour, we ask you to include money in your verdict in the amount of $950,000.*" (Emphases added.)

29

Instruction No. 19 explained to the jury the damages that could be awarded on the wrongful death claim:

"*Economic damages include*:

"1. *Loss of attention, care, and loss of a complete family*.

"2. Reasonable funeral expenses.

"*For item 1, above, you should allow an amount that you believe would be equivalent to the benefit plaintiffs . . . could reasonably have expected to receive from the continued life of the deceased*.

"*Noneconomic damages include*:

"1. Mental anguish, suffering, or bereavement.

"2. *Loss of Society, loss of comfort, or loss of companionship*.

"*For noneconomic damages, there is no unit value and no mathematical formula the court can give you. You should allow an amount that you find to be fair and just under all the facts and circumstances*." (Emphases added.)

Defendants objected to Instruction No. 19, claiming "[i]t submits *Wentling* damages. And we think under . . . *Wentling* and subsequent cases that evidence needs to be presented, that was not presented in this case, to justify *Wentling* damages, *which would be a financial loss beyond a noneconomic loss to the parents*." (Emphasis added.) Defendants were referring to *Wentling v. Medical Anesthesia Services,* 237 Kan. 503, 512-13, 701 P.2d 939 (1985) (husband proved economic damages for "loss of services, care, and guidance" from wife's death by showing closeness of the marriage, care during husband's illness and assistance with his job, and caring for handicapped child,

30

amounting to at least 98 hours per week of services, care, and guidance). The trial court ruled the evidence by Joel's parents was sufficient to support giving Instruction No. 19.

After trial, defendants renewed their objection, focusing on the $550,000 economic award for the "[l]oss of attention, care, and loss of a complete family" line item. They argued they were entitled to judgment as a matter of law because there was not competent evidence to support that award. And in a separate argument, they contended these economic damages were excessive and resulted from passion or prejudice, which warranted a new trial. They asked for a new trial as an alternative to their request for judgment as a matter of law. As a final alternative, they sought remittitur to reduce or eliminate the economic damages award because, in their view, it was not supported by the evidence and shocked the conscience.

Before the panel, defendants continued challenging the $550,000 award on two grounds. First, they argued the economic damages component entitled "loss of a complete family" in the line item did not constitute economic damages since it was "indistinguishable from nonpecuniary damages such as loss of society, comfort or companionship." Second, they renewed their argument that the evidence did not support a loss of "services, counsel, guidance, financial support or anything else of an economic nature." They framed the issue as a jury instruction challenge. They did not renew with the panel their alternative arguments that a new trial was appropriate because the verdict was excessive or subject to remittitur.

Accepting this as a jury instruction issue, the panel held the insufficient evidence question was argued to the trial court, so it was preserved for appeal. But as to the "loss of a complete family" descriptor, the panel decided defendants did not raise that with the district court, so it was unpreserved and subject to the clear error standard of review. *Burnette*, 52 Kan. App. 2d at 766; see also K.S.A. 2017 Supp. 60-251(d) (clear error

31

standard applies when "an error in the instructions . . . has not been preserved"); *In re Thomas*, 301 Kan. 841, 846, 348 P.3d 576 (2015) (To decide whether a challenged instruction is clearly erroneous, the court "must assess whether it is firmly convinced the jury would have reached a different verdict had the instruction error not occurred.").

As to the sufficiency challenge, the panel rejected it, noting the evidence established that Joel "'devoted great care to his parents, . . . engaged in numerous and regular activities with his parents, . . . was very attentive to the needs of his parents, and . . . was very close to his parents.'" *Burnette*, 52 Kan. App. 2d at 773-74. In doing so, the panel relied on *Wentling*, 237 Kan. at 512-13, as well as *Huffman v. Thomas*, 26 Kan. App. 2d 685, 693, 994 P.2d 1072 (1999) (holding evidence created jury question whether parents suffered economic damages for "loss of services, loss of attention, loss of filial care, [and] loss of protection" from adult son's death, noting he lived at home, father and mother were disabled, son helped around house, contributed money for household expenses, and parents had loving relationship with son).

As to the "loss of a complete family" descriptor, the panel agreed Instruction No. 19 was legally inappropriate as potential economic damages. *Burnette*, 52 Kan. App. 2d at 769-70. For this, it relied on *Howell v. Calvert*, 268 Kan. 698, 707, 1 P.3d 310 (2000) (holding damages for loss of "the value of a continued family relationship" and "[l]oss of enjoyment and entertainment" were "strikingly similar to loss of society, comfort, or companionship," which are noneconomic damages).

Even so, the panel affirmed the $550,000 award. Applying the clear error standard, the panel held it was not firmly convinced the jury would have awarded a different amount without the error. The panel reasoned, "[T]he jury awarded $550,000 for 'loss of attention, care and loss of a complete family,' [and] [g]iven that the issue was not itemized separately, we have no means to differentiate between how the jury viewed the

three claims or apportioned its award." *Burnette*, 52 Kan. App. 2d at 770. It explained that even though the district court should not have instructed on "loss of a complete family" as an economic damage, the $550,000 award was not so large it should be considered excessive or contrary to the evidence. 52 Kan. App. 2d at 771. To illustrate its difficulty, the panel referenced this passage from *Wentling*:

> "'The clear error standard of review leads in most cases to affirmance of the trial court's determination of damages. Ordinarily, reversal will be warranted only where:
> (1) there was no evidence at all to establish the element of loss upon which the award in issue was based; or
> (2) the award was so patently contrary to the evidence as to shock the conscience of the court.'" *Wentling*, 237 Kan. at 511.

*Standard of Review*

For jury instruction issues, we apply an analytical progression with corresponding standards of review, which we have described as:

> "'(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011) . . . .' [Citation omitted.]" *Foster v. Klaumann*, 296 Kan. 295, 301-02, 294 P.3d 223 (2013).

33

*Discussion*

Defendants properly preserved their factual appropriateness challenge to the economic loss damage item, i.e., "[l]oss of attention, care, and loss of a complete family," by objecting on that basis. Their legal challenge to the specific language of "loss of a complete family" was raised for the first time on appeal.

We must repeat that the panel's holding that it was error to allow the jury to consider evidence of "loss of a complete family" as an economic loss item is settled for our purposes. Given this posture, we consider the "loss of a complete family" item in the instructions as legally inappropriate. The impact from that error will be discussed later.

Similarly, defendants do not argue the remaining "[l]oss of attention [and] care" language was a legally inappropriate descriptor for items of economic loss. This leaves us to decide whether the "[l]oss of attention [and] care" descriptor as an economic loss line item was properly submitted to the jury given the evidence, i.e., factually appropriate.

We conclude the evidence failed to sufficiently connect the "[l]oss of attention [and] care" claim with any evidence of a demonstrated economic character capable of being valued under *Wentling*, i.e., based on the jury's common-sense understanding about what a claimed item of actual loss costs in the marketplace. See *Wentling*, 237 Kan. at 514-15. We acknowledge loss of care and attention damages are properly recoverable in a wrongful death action, but whether such losses can be characterized as economic or noneconomic turns on the evidence. And this difficulty is particularly acute when the claims are so generalized as they were in this case.

A trial court must instruct only on those damages for which there is evidence to base an award. K.S.A. 60-1903(e). K.S.A. 60-1904(a) lists nonexclusive items of

34

recoverable damages: "(1) [m]ental anguish, suffering, or bereavement; (2) loss of society, companionship, comfort or protection; (3) loss of marital care, attention, advice or counsel; (4) loss of filial care or attention; (5) loss of parental care, training, guidance or education; and (6) reasonable funeral expenses for the deceased."

The statute does not distinguish between economic and noneconomic losses. Nonetheless, K.S.A. 60-1903 provides that "damages, other than [economic] loss sustained by an heir at law, cannot exceed in the aggregate the sum of $250,000 and costs." Moreover, it requires that a wrongful death verdict

"shall be itemized by the trier of fact to reflect the amounts, if any, awarded for:

"(1) [economic] damages;

"(2) expenses for the care of the deceased caused by the injury; and

"(3) [economic] damages other than those itemized under subsection (c)(2)."

The pattern jury instructions introduce Kansas juries to the required categorization of damages as economic versus noneconomic. PIK Civ. 4th 171.02 (2016 Supp.) defines these terms:

"Economic loss includes loss of time or income and losses other than medical expenses incurred as a result of plaintiff's injuries to date (and the economic loss plaintiff is reasonably expected to incur in the future) [reduced to present value].

" . . . Noneconomic loss includes pain, suffering, disabilities, disfigurement and any accompanying mental anguish suffered as a result of plaintiff's injuries to date (and the noneconomic loss plaintiff is reasonably expected to suffer in the future) [reduced to present value]."

35

PIK Civ. 4th 171.32 details damages for the wrongful death of a child. It identifies four items as economic: (1) loss of filial care, attention, or protection; (2) loss of earnings the child would have contributed to the parents during the remainder of the child's lifetime; (3) expenses for the deceased child's care caused by the injury; and (4) reasonable funeral expenses. PIK recommends juries be expressly told: "For items 1 and 2 above you should allow an amount that you believe would be *equivalent to the benefit plaintiff could reasonably have expected to receive from the continued life of the deceased*." (Emphasis added.)

PIK Civ. 4th 171.32 identifies two items as noneconomic damages: (1) mental anguish, suffering, or bereavement; and (2) loss of society, loss of comfort, or loss of companionship. As to these, PIK recommends the jury be further advised: "For noneconomic damages *there is no unit value and no mathematical formula the court can give you. You should allow an amount that you find to be fair and just under all the facts and circumstances*." (Emphasis added.)

It is noteworthy PIK Civ. 4th 171.32 distinguishes noneconomic damages as having no unit value or mathematical formula and simply admonishes the jury to be "fair and just under all the facts and circumstances." But for economic damages, provable damages, i.e., "expenses," are mentioned for items 3 and 4; and items 1 and 2 are discussed in terms of "equivalent" benefit. This distinguishes economic damages as those that are capable of computation or conversion using some equivalence to a monetary basis or material standard based on the marketplace. See *Wentling*, 237 Kan. at 514-15. This stands in contrast to noneconomic damages, which must be understood to require valuing based on the plaintiff's unique and personal suffering from a loss that cannot be replaced.

36

Parents suing for the wrongful death of an adult child are not foreclosed from claiming economic loss. "Pecuniary loss for the parent of an adult child is defined as the care, maintenance, support, services, advice, counsel, and reasonable contributions *of a pecuniary value* that the parents would, in reasonable probability, have received from their child had the child lived." (Emphasis added.) 1 Stein on Personal Injury Damages Treatise § 3:37 (3d ed. 2018). And our caselaw demonstrates that economic value—even if a precise value is not readily ascertainable—is the touchstone for distinguishing between economic and noneconomic losses. In short, economic losses are the "loss of money or of something by which money or something of money value may be acquired." *McCart v. Muir*, 230 Kan. 618, 626, 641 P.2d 384 (1982).

Even so, our court has emphasized that losses need not be proven with mathematical precision through experts. *Wentling*, 237 Kan. at 508 (rejecting argument that wrongful death economic damages evidence must provide "monetary figures sufficient to calculate both the value of the loss and proposed compensation"). Economic "loss or damages in a wrongful death case should be equivalent to those [economic] benefits or compensation that reasonably could have been expected to have resulted from the continued life of the deceased." *McCart*, 230 Kan. at 626.

"In some states there is a presumption of [economic] injury, especially those limiting recovery to [economic] losses, in the loss of a child's society, which presumption applies also to the death of an adult child." 1 Stein on Personal Injury Damages Treatise § 3:37 (3d ed. 2018) (citing *Bullard v. Barnes*, 102 Ill. 2d 505, 517, 468 N.E.2d 1228 [1984], and *Ballweg v. Springfield*, 114 Ill. 2d 107, 499 N.E.2d 1373 [1986]). But such a presumption is inconsistent with Kansas caselaw. See *Howell*, 268 Kan. at 707 (holding "[l]oss of the value of a continued family relationship" was not economic damage since the item of loss was "strikingly similar to loss of society, comfort or companionship— [noneconomic] damages"). In other words, the economic damages and their value

claimed by Joel's parents cannot be presumed—they must be proven and be capable of being valued.

In *Wentling*, the court affirmed an economic damage award based on evidence of a homemaker's services, care, and guidance. Notably, an expert was unable to place a specific dollar figure on some loss items but testified the deceased's services—such as moral, social, and educational training—"*have real economic value* insofar as they contribute to a person's welfare and ability to mature, interact and obtain productive employment in society." (Emphasis added.) *Wentling*, 237 Kan. at 513. And the husband provided testimony on "the extent of services, attention, marital care, advice and protection he was receiving from his wife, as well as the parental" services rendered and lost. 237 Kan. at 513. In particular, the *Wentling* court highlighted how the husband testified

> "in detail concerning the couple's closeness in their marriage, [decedent's] *care during his illnesse*s, and even her on-site *assistance at some of his construction jobs*. Although [she] was naturally upset with her first son's handicap, she and her husband determined to *keep the boy at home rather than place him in an institution or foster home*. [She] appears to have been the moving force in her first son's life. She joined support groups, read extensively for information on Down's syndrome, spent time with the physical therapist for instructions on how to work with him, and attended to all the child's medical problems. [Her husband] testified [she] *spent at least 98 hours per week providing services, care and guidance*." (Emphases added.) 237 Kan. at 512-13.

All parties in *Wentling* conceded losses for "services, care and guidance" were "valuable per se and [economic] in nature." 237 Kan. at 514. Yet even though no actual dollar evidence of value or estimated value was presented, the court held it was within the jury's province to determine those losses' monetary value. 237 Kan. at 514. The court reasoned "[t]he mere fact these items of loss, having acknowledged economic value, are

incapable of exact economic *valuation* does not mean plaintiff should be denied recovery. *The jury was capable of exercising its collective experience and judgment in this matter*." (Emphasis added.) 237 Kan. at 514. Put another way, the jurors were not being asked to speculate, or to simply be "fair and just under all the facts and circumstances" as they would be when valuing noneconomic damages.

This court has said of pain and suffering, which is a noneconomic loss:

"'Pain and suffering have no known dimensions, mathematical or financial. There is no exact relationship between money and physical or mental injury or suffering, and the various factors involved are not capable of proof in dollars and cents. For this very practical reason the only standard for evaluation is such amount as reasonable persons estimate to be fair compensation for the injuries suffered, and the law has entrusted the administration of this criterion to the impartial conscience and judgment of jurors, who may be expected to act reasonably, intelligently and in harmony with the evidence.'" *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 346, 757 P.2d 251 (1988), *disapproved of on other grounds by Bair v. Peck*, 248 Kan. 824, 811 P.2d 1176 (1991).

The panel analogized the evidence presented by Joel's parents for loss of attention and care to the evidence discussed in *Huffman v. Thomas*, 26 Kan. App. 2d 685, 994 P.2d 1072 (1999). *Burnette*, 52 Kan. App. 2d at 773. In *Huffman*, a Court of Appeals panel held there was sufficient evidence to support an economic damages award submitted to the jury in five separate categories: "loss of services, loss of attention, loss of filial care, loss of protection, and funeral expenses." *Huffman*, 26 Kan. App. 2d at 693. The jury was instructed the "amount awarded . . . *should be equivalent to the monetary benefits or compensation . . . [plaintiffs] could have expected to receive*." (Emphasis added.) 26 Kan. App. 2d at 693.

The *Huffman* panel noted:

"[Decedent] was 22 years old. He lived at home with his parents. . . . [H]is father . . . is disabled and unable to work. . . . [H]is mother . . . is a double amputee. [The father] testified that [decedent] helped around the house and the yard, trimming and cutting down dead trees. [Decedent] also remodeled the family bathroom. [He] helped his mother by doing laundry and other household chores. He also helped her with heavy lifting and other tasks that [she] was unable to perform, and he contributed money for household expenses.

"Both [plaintiffs] testified about their loving relationship with [decedent]. The family spent a lot of time together in the evenings, watching basketball and talking. [Plaintiffs] presented testimony from friends and neighbors who knew [decedent]. [One] described [decedent] as a willing, friendly, and kind person[, and] . . . a 'really caring person' who helped out around the house." 26 Kan. App. 2d at 692-93.

After noting the evidence regarding specific services or contributions made around the house in *Huffman*, the *Burnette* panel reasoned,

"[W]ith respect to the claims for loss of attention and care, this court noted [in *Huffman*] the evidence of 'the companionship' the son provided. Specifically, this court pointed to evidence supporting 'the loving relationship' between the parents and their child, that '[t]he family spent a lot of time together,' and that the son was a 'caring person.' 26 Kan. App. 2d at 693." *Burnette*, 52 Kan. App. 2d at 773.

The panel's reading of *Huffman* does not withstand scrutiny. Nothing in *Huffman* suggests the panel's analysis was specifically directed at just the claims for loss of attention and care. Rather, the *Huffman* panel only considered generally the defendant's arguments that the *Huffman* plaintiffs had "failed to establish the nature and extent of the [economic] damages they sustained" and that the amount awarded "was not supported by the evidence." 26 Kan. App. 2d at 691, 693. *Huffman* does not stand for the proposition

40

that evidence of a loving parent-child relationship, a caring disposition, or evidence of time spent together as a family are enough to prove economic loss without something more.

The *Huffman* panel's evidence recitation could as easily be explained as showing the jury was permitted to conclude a strong family relationship was relevant to demonstrating a probability of future loss. See 1 Stein on Personal Injury Damages Treatise § 3:37 (3d ed. 2018) ("The test of the right to recover is whether the fact adduced indicates a probable willingness by the decedent and his or her ability to continue contributions to the beneficiary in the future."). But nothing in the evidence about Joel's close relationship and loving companionship with his parents, his attentiveness, or his caring nature propelled the loss of care and attention claim into the realm of economic loss—something understood as having equivalence to a monetary basis or material standard in the marketplace.

Though we do not intend to diminish this loss, there was no evidence establishing more than a speculative or subjective basis for the jury to conclude Joel would have contributed money or *economically* valuable services to them. Indeed, no claim for loss services was made. And this was tellingly demonstrated by plaintiffs' closing argument that merely offered the jury wide ranging hourly or per diem amounts as the supposed guide for valuing the then-claimed "[l]oss of attention, care, and loss of a complete family" line item; or suggested damages could be based on how much "more important" the jury viewed the Burnettes' losses than Joel's medical expenses or lost wages.

Reduced to its essence, plaintiffs simply asked the jury to be fair and just when considering this component of their claimed economic losses, which is the same valuation methodology used for noneconomic damages. The evidence provided nothing on which a jury could base an economic valuation—even under *Wentling*'s presumption

41

that juries are capable of converting economic losses into their monetary equivalents on the basis of their own experience and knowledge. *Wentling*, 237 Kan. 503, Syl. ¶ 1.

The economic damages in *Wentling* were supported by evidence about actual services lost, which were understood to be of the type capable of being purchased, e.g., providing in-home, rather than out-of-home, care for a disabled child; or things that would have otherwise economically benefitted plaintiffs, e.g., guidance that would have contributed to the child's ability to obtain future employment. But there was no loss of services claim by Joel's parents. And the evidence presented about actual losses from Joel's death did not establish—or even reference—any economic dimension. The jury had nothing to associate the loss of care and attention claim to some reasonable basis for monetary computation or equivalence to enable it to arrive at an economic loss recovery.

Given this, it becomes readily apparent this item of loss was indistinguishable from those for which the jury was permitted to award noneconomic damages under the jury instruction defining those to include "[l]oss of society, loss of comfort, or loss of companionship." And the jury gave Joel's parents all they asked for in noneconomic damages.

Accordingly, Instruction No. 19 was factually inappropriate in that it permitted the jury to award economic damages for loss of care and attention without evidentiary support and it was error under these facts to include this item as a separate verdict form entry apart from nonpecuniary damages. Cf. *Leiker v. Gafford*, 245 Kan. 325, 340, 778 P.2d 823 (1989) (holding loss of enjoyment of life is not an independent category of nonpecuniary damages and, therefore, separate instruction or separate verdict form entry on the item was error), *overruled on other grounds by Martindale v. Tenny,* 250 Kan. 621, 829 P.2d 561 (1992).

Having concluded the instruction was both legally inappropriate because of the "loss of a complete family" descriptor based on the panel's decision and factually inappropriate because of the evidence presented, we must also conclude these errors were not harmless. Admittedly, this analysis is complicated because we are facing two errors, only one of which is preserved, making the standards of review different. But because these errors together mean it was error to submit this as an item of economic loss, the misclassification cannot withstand any test for harmlessness.

In short, K.S.A. 60-1903(c) requires a verdict to be itemized to reflect noneconomic and economic damages. Instruction No. 19 inappropriately identified "loss of a complete family" as economic damages, and the evidence at trial did not support the remaining instruction classifying the "[l]oss of attention [and] care" claim as an economic one. Absent these jury instruction errors, we conclude the jury would not have awarded $550,000 as economic damages under the line items for past and future "[l]oss of attention, care, and loss of a complete family." It would not have had the option to do so. These errors were not harmless.

The appropriate remedy is to reverse and vacate the $550,000 award only as to these losses because the jury lacked an evidentiary basis to award damages for this line item. See *Wackman v. Rubsamen*, 602 F.3d 391, 408 (5th Cir. 2010) (reversing portion of the jury's damage award because plaintiffs failed to produce evidence to support any damages for the challenged item); *Rosario v. City of Union City Police Dept.*, 263 F. Supp. 2d 874 (D. N.J. 2003) (vacating wrongful death damages under scheme that permitted recovery only for pecuniary loss when evidence failed to supply jury with adequate basis to value the claimed losses); *Carrano v. Yale-New Haven Hosp.*, 279 Conn. 622, 653, 661, 904 A.2d 149 (2006) (holding evidence insufficient to permit jury to find plaintiff suffered economic loss due to loss of decedent's disability income when evidence failed to establish such income exceeded decedent's expenses, reversing

43

judgment, and remanding for new judgment in amount excluding economic loss); *Horner v. Sani-Top, Inc.*, 143 Idaho 230, 237, 141 P.3d 1099 (2006) (holding evidence insufficient to support award for loss of financial support from decedent, and trial court erred denying motion to alter or amend judgment to eliminate the award).

The district court's judgment with respect to liability is affirmed. Its judgment with respect to the $550,000 challenged economic damages is reversed and vacated. The case is remanded for judgment to be entered consistent with this decision.