No. 83,944

ARNOLD LEE REYNOLDS, Administrator for the Estate of Connie Reynolds, Deceased; ARNOLD LEE REYNOLDS, Individually; and RHONDA REYNOLDS, *Appellees*, v. KANSAS DEPARTMENT OF TRANSPORTATION, *Appellant*.

(43 P.3d 799)

Opinion filed April 19, 2002.

*Vicky S. Johnson*, staff attorney, of Kansas Department of Transportation, argued the cause, and *Michael B. Rees*, chief counsel, was with her on the briefs for appellant.

*Constance Crittenden Owen*, of Overland Park, argued the cause, and *Lon Walters*, of The Walters Law Firm, LLC, of Kansas City, Missouri, and *Julie Frickleton*, of Leawood, were on the brief for appellees.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is a wrongful death and personal injury action filed by Arnold and Rhonda Reynolds against James and

Karen Van Kirk, Everett Jones, and the Kansas Department of Transportation (KDOT). The trial court entered judgment on a jury verdict that found KDOT 35% at fault, Jones 45% at fault, and Arnold Reynolds 20% at fault. KDOT appealed from the trial court's denial of its motions for summary judgment and directed verdict. The Court of Appeals reversed and remanded. *Reynolds v. Kansas Dept. of Transportation*, 29 Kan. App. 2d 695, 30 P.3d 1041 (2001). The Reynolds' petition for review was granted.

On appeal, KDOT argues that it did not owe a duty to the Reynolds, and if it did, there was insufficient evidence KDOT's failure to maintain its fence was the proximate cause of the injuries and damages sustained by the Reynolds.

On August 1, 1997, at approximately 9 p.m., a vehicle driven by Arnold Reynolds struck a cow. The vehicle left the road and struck an embankment. Arnold's wife Connie was killed, and their daughter, Rhonda, was severely injured.

The Reynolds' vehicle was southbound on Highway 69 approximately 2½ miles north of the Louisburg exit. Where the accident occurred, Highway 69 is a four-lane road with a grassy median between north and southbound lanes. It is a controlled access road.

259th Street passes over Highway 69. The rock embankment hit by the Reynolds' vehicle is on the right shoulder of the southbound lanes "just past 259th." When the vehicle struck the cow, it veered off the road and into the embankment. There is no access to Highway 69 at 259th Street.

Between 259th Street and 263rd Street, there is a large culvert that passes beneath Highway 69. A stream flows through the culvert from east to west. The property on the east end of the culvert belongs to Lee Phillips, and he has an orchard there. Everett Jones leased 40 acres on the west side and pastured some cattle there. Before August 1, 1997, Jones had 11 cows. After the vehicle accident, he was missing one cow.

In this vicinity, a KDOT fence parallels Highway 69 on either side and completely seals it off. Where there is an overpass, the KDOT fence "snugs up" to the overpass to seal off Highway 69. The fence is heavy gauge woven wire with 4-to 5-inch openings.

The posts are metal and there is a strand of barbed wire along the top. Lee Phillips described the fence as a "cattle type" fence.

KDOT fence runs over the top of the culvert. KDOT does not fence across the openings of the culvert. Jones installed a water gap at the mouth of the culvert when he began leasing the pasture. He also built a water gap on the Phillips end of the culvert. He regularly had to repair the fence on both sides of the culvert and the water gap on the Jones' side of the culvert. The repairs were necessitated by heavy water flow after rainstorms.

Jones, a seasonal concrete worker, began leasing the property and grazing cattle there in 1988. Jones testified that his cattle had gone through the culvert and onto Phillips' property three times. Phillips testified that he knew of two times when the cattle had gotten on his property. Rainstorms wash debris and logs against the water gap, necessitating repairs. Jones repaired or rebuilt the water gap at the culvert three times. William Michael Lackey, retired assistant Secretary of KDOT, acknowledged the difficulty in adequately fencing the culvert due to heavy water flow during and after a rainstorm.

Phillips testified that the KDOT fence on his side of Highway 69 had been down at least a year and a half before August 1997. A fence post had been knocked completely down. He had seen deer go through the gap in the fence quite often. Phillips did not report the broken fence because he saw KDOT employees mowing and believed that they would see that it needed to be repaired. That stretch of Highway 69 had been mowed twice in 1997 before the accident. David Arbogast, KDOT maintenance supervisor for the Louisburg area, testified that he inspects the fences weekly from the road. Lackey expressed the opinion that it would be a waste of resources for KDOT to inspect fences annually. He testified that maintaining fence was "very low" on KDOT's priority list.

Lackey said that KDOT fence was not for keeping cattle in, but he recognized that farmers do not install a second fence that runs alongside a KDOT fence. He testified that fence repair becomes a priority when a farmer keeps cattle and uses KDOT fence.

KDOT's official manual provides that the purposes of fencing are to control access, provide safety to traveling public, prevent indiscriminate crossing of medians or ramps by vehicles or pedestrians, and prevent encroachments on the right of way.

With regard to maintenance and inspection of fencing, KDOT's manual provides:

"The State Owned Fences are to be maintained as originally constructed and in such a condition that they:

 a. Serve their intended purpose.

 b. Present a satisfactory appearance.

"Fences Which Have been Damaged to the extent that their effectiveness is severely reduced should be repaired immediately. A temporary repair may be necessary until permanent repairs can be made.

"State Owned Fences Should Be Inspected a minimum of once per year and repairs made where needed.

"When damage to Private Fences is observed, which affects the protection of the highway user, the owner should be promptly notified."

Arbogast testified that even if he had known that the fence to Phillips' property was down, he would not have repaired it immediately. His crew would have repaired it "when we got time." Arbogast testified that he knew that the land adjoining this stretch of fence did not have livestock on it, and, for that reason, he would repair the fence as soon as possible but not immediately.

The evening of August 1, 1997, 10 to 12 cows were located by highway patrol troopers and Miami County sheriff deputies on the east side of Highway 69 along the highway side of the fence line immediately on the north side of 259th. A farmer with a pasture on the west side of Highway 69 offered to allow the cows to be kept in his pasture temporarily. The farmer and officers cut the KDOT fence on the northeast corner of the overpass in order to get the cows onto 259th Street. They planned to herd the cows across the bridge to put them into the farmer's pasture.

Once they got the cattle onto 259th Street, one cow left the herd. It jumped the guard rail, ran 25 to 30 feet to another fence, cleared the fence and ran approximately 50 to 100 yards to the southeast. The officers thought the lone cow was safely fenced in. They herded the other cows across the bridge and into the farmer's pasture. Before the officers got back to their vehicles, the Reynolds'

vehicle hit a cow in a southbound lane of Highway 69 just south of 259th St.

After the accident, Phillips saw cattle tracks in the mouth of the culvert on the east side of Highway 69. Around the downed fence, the grass was "pretty deep." Phillips saw no evidence on or around the downed fence to show whether the cattle crossed it.

The Reynolds sued Jones; the Van Kirks, owners of the pasture Jones rented; and KDOT. Jones settled, and the trial court entered summary judgment in favor of the landowners. KDOT's motion for summary judgment was denied, and the Reynolds proceeded to trial against KDOT. KDOT's motion for directed verdict also was denied. The jury returned a verdict that found KDOT 35% at fault, Jones 45% at fault, and Arnold Reynolds 20% at fault. The jury awarded Rhonda Reynolds $705,521.65 and Arnold Reynolds $473,774. *Reynolds,* 29 Kan. App. 2d at 697.

KDOT appealed. The Court of Appeals reversed and remanded with the instruction to the trial court to enter a verdict on behalf of KDOT. The Court of Appeals held that KDOT did not owe a duty to the Reynolds. 29 Kan. App. 2d at 699-700. The Court of Appeals also expressed the opinion that the proximate cause of the accident was the cow's escape through the culvert, for which KDOT bore no responsibility. 29 Kan. App. 2d at 700-01. The Reynolds' petition for review was granted.

We first determine if KDOT owed a duty to the Reynolds. The Reynolds claimed that the cow they hit "was allowed access to 69 Highway by a KDOT fence in disrepair." They alleged that KDOT was negligent in failing to maintain the fencing sufficiently to prevent livestock from entering upon the highway and/or in failing to keep the highway in a reasonably safe condition. The jury was instructed that KDOT "has a duty to maintain its highways in a reasonably safe condition" and that the violation of this duty was negligence. The jury also was instructed that KDOT "has no duty to install a fence across the entrance or exit of the box culvert in question."

As the Court of Appeals stated, whether KDOT owed a duty to the Reynolds is a question of law. 29 Kan. App. 2d at 700, 701. The reasoning of the Court of Appeals seems to have been that

the cattle escaped from their pasture through the culvert, KDOT did not have a duty to fence the culvert, and there was no evidence that the cow got onto the highway by going through the damaged fence. Hence, according to the Court of Appeals, KDOT owed no duty to the Reynolds under the circumstances. 29 Kan. App. 2d at 700-01.

We do not agree with the Court of Appeals' reasoning and conclusion. The statement that KDOT does not have a duty to fence the opening of the culvert is well taken. The remaining portion of the Court of Appeals' statement, however, is not. The subject of the discussion in this first issue is KDOT's duty. The subject of the second issue is the separate question of causation. The Court of Appeals simply mixed the two together, and in so doing put the horse in the cart. In *Nero v. Kansas State University*, 253 Kan. 567, Syl. ¶ 1, 861 P.2d 768 (1993), we held:

"To recover for negligence, the plaintiff must prove the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered. Whether a duty exists is a question of law. Whether the duty has been breached is a question of fact."

KDOT has a common-law duty to protect the motoring public. *Trout v. Koss Constr. Co.*, 240 Kan. 86, 91-93, 727 P.2d 450 (1986). The common-law duty of KDOT to keep the highways in a reasonably safe condition is nondelegable due to its importance to citizens. 240 Kan. at 93-94. KDOT installs fences along controlled access highways, such as Highway 69 where the Reynolds' accident occurred, for the purpose, among others, of providing safety to the traveling public. Farmers rely on the state fences rather than installing private fences alongside the state ones. Having undertaken the job of fencing along the portion of Highway 69 north of Louisburg, KDOT had a duty to maintain its fences. See *Circle Land & Cattle Corp. v. Amoco Oil Co.*, 232 Kan. 482, 488-89, 657 P.2d 532 (1983).

KDOT argued in its motions to the trial court and again on appeal that it *only* has a duty to maintain its fences where livestock are present. The Court of Appeals' decision was greatly influenced by KDOT's position, thus blending the questions of duty and causation.

KDOT's argument and the Court of Appeals' opinion are contrary to the long-established principle that one who undertakes to act so that another reasonably relies becomes subject to the duty to perform his undertaking with reasonable care. 232 Kan. at 488-90. KDOT's argument and the Court of Appeals' opinion also assume an impractical level of KDOT knowledge of landholders' practices and an unrealistic expectation that land uses never change. In addition, KDOT's own maintenance manual commits KDOT to immediately repair its fences where damage severely reduces their effectiveness in providing safety to the traveling public, which was the situation in this case. The fence between Phillips' land and Highway 69 was down, and deer had been seen passing through the gap quite often for a year and a half. Deer and cattle, as demonstrated by the one that left the herd in this case, can jump a KDOT fence, but a well-maintained fence between a field and a highway offers some measure of protection for the motoring public. KDOT had a duty to repair its fence promptly, whether or not Phillips kept livestock. KDOT did not do so. In addition, KDOT was aware that heavy water flow could and usually would damage or destroy water gaps installed on the culverts, the result obviously being that cattle could escape onto the Phillips' land during or after a rainstorm.

In *Trout*, Trout was injured when his truck struck a number of horses on Interstate 70, which was being resurfaced. On the night of the accident, the construction crew had removed a worn or damaged portion of the permanent fence and failed to put up a temporary fence when they quit work that night. Trout claimed similar acts of negligence on the part of KDOT, as were raised in the present case, including failure to maintain the highway in a reasonably safe condition and failure to maintain and inspect the fence. There, as here, KDOT took issue with the jury being instructed that it had a duty to maintain the highway in a reasonably safe condition. This court stated:

"Appellant does not dispute that it has a duty of reasonable care to the motoring public but contends there is a difference between maintaining a highway in a 'reasonably safe condition' and refraining from, by act or omission, acting negligently. We see little, if any, distinction. The maintenance of the highway in a

reasonably safe condition is the duty that is owed the public while the acts and omissions of the State's employees in carrying out that duty may or may not constitute negligence." 240 Kan. at 91.

The trial court correctly denied KDOT's motions for summary judgment and directed verdict on the issue of duty.

Having determined that a duty exists, we turn to whether KDOT's failure to maintain its fence contributed to the injuries and damages sustained by the Reynolds. In *Trout*, we said:

"At any given time, a particular location on a highway may be either in a 'reasonably safe condition' or not in a 'reasonably safe condition.' What constitutes a 'reasonably safe condition' will necessarily vary according to terrain, time of day, weather conditions, and other factors. If an unsafe condition arises from improper conduct by a state employee, then the State may incur liability. Similarly, if the condition arises from the failure of the State to perform a required act, liability may also result. However, if the dangerous condition arises through remote or unforeseen circumstances, of which the State had no notice, ordinarily liability will not attach." 240 Kan. at 91.

In its motions in the trial court, KDOT argued that there was not sufficient evidence of causation. There were several layers and emphases to the causation argument.

First, KDOT argued that its damaged fence was not the proximate cause of the plaintiffs' accident because the cattle initially escaped from their pasture through the culvert. The Court of Appeals adopted the argument and concluded that any negligence by KDOT was not the proximate cause of the accident because the proximate cause "was the escape of the cow through the culvert." 29 Kan. App. 2d at 701. It sounds as if the Court of Appeals believed that there could be only one cause of the accident, but, since adoption of comparative negligence in 1974, Kansas courts compare the percentages of fault of all alleged wrongdoers. K.S.A. 60-258a. Proximate cause is not an obsolete concept in Kansas law, but when it has been mentioned by this court in recent years it typically has been in a criminal context. See *State v. Sophophone*, 270 Kan. 703, 708-12, 19 P.3d 70 (2001) (felony-murder), *State v. Anderson*, 270 Kan. 68, 71-72, 12 P.3d 883 (2000) (involuntary manslaughter); in discussions of decisions from other states, *Glaser v. U.S.D. No. 253*, 271 Kan. 178, 181-86, 21 P.3d 573 (2001), and *State v. Davidson*,

267 Kan. 667, 683, 987 P.2d 335 (1999); and in stating a party's argument, *Carlson v. Ferguson*, 270 Kan. 576, 580, 17 P.3d 333 (2001), *Kuhn v. Sandoz Pharmaceuticals Corp.*, 270 Kan. 443, 449, 14 P.3d 1170 (2000). The only recent case in which this court has discussed proximate cause as an enduring principle in a negligence action is *Cullip v. Domann*, 266 Kan. 550, 972 P.2d 776 (1999), which involved the very narrow subject of negligence per se. The court stated: "Liability in damages cannot be predicated on a *violation of a statute* unless the breach of the law is the proximate cause of the injury or damages, or substantially contributes thereto. A connection must be established between the *violation* proved and the damage or injury occasioned. (Emphasis added.)" 266 Kan. 550, Syl. ¶ 4. "In Torts, 3rd ed, p 282, Professor Prosser wrote, '[p]roximate cause is a heritage of Lord Bacon who, in his time, committed other sins.' It would seem that Kansas needs no longer to be a land in which his sins proliferate." PIK 3d Civil 104.01, Comment. With the adoption of comparative fault, Kansas has moved beyond the concept of proximate cause in negligence.

In a comparative fault system, "distinctions between primary, secondary, active and passive negligence lose their previous identities. The nature of misconduct in such cases is to be expressed on the basis of degrees of comparative fault or causation, and the 'all or nothing' concepts are swept aside." *Kennedy v. City of Sawyer*, 228 Kan. 439, Syl. ¶ 6, 618 P.2d 788 (1980). A jury is instructed to "weigh the respective contributions of the parties" in making the apportionment of percentage of fault. PIK 3d Civil 105.05. In the present case, the jury was correctly instructed that "[a] party is at fault when he or she is negligent and that negligence caused or contributed to the event which brought about the injury or damages for which claim is made."

In *Nero*, we held that ' "[w]hether risk of harm is reasonably foreseeable is a question to be determined by the trier of facts. Only when reasonable persons could arrive at but one conclusion may the court determine the question as a matter of law. [Citation omitted.]" ' 253 Kan. at 583.

Intervening and superseding causes, which cut off liability for earlier negligence, are still recognized in extraordinary cases. See

PIK 3d Civil 104.03, *Aldoroty v. HCA Health Services of Kansas, Inc.*, 265 Kan. 666, 678-79, 962 P.2d 501 (1998) (discussing *Tinkler v. U.S. by F.A.A.*, 982 F. 2d 1456 (10th Cir. 1992). There was no request for instructions on intervening or superseding causes in this case.

The second layer of KDOT's causation argument includes two questions. The first is whether there was enough evidence that the cattle left private land through the gap in the KDOT fence. There was circumstantial evidence that the cattle left their pasture on the west side of the highway and went through the culvert to the east side. That circumstantial evidence was that Jones' cattle several times before had gotten onto Phillips' land and that after the Reynolds' accident Phillips, who did not keep cattle, saw cattle tracks at his end of the culvert. There also was circumstantial evidence that the cattle left Phillips' land and got onto the State-owned land flanking the highway by going over the damaged KDOT fence. That the fence was down was a known fact. The cattle that were found on the State-owned land flanking Highway 69 did not belong there. There was evidence that the KDOT fence parallels the highway on both sides and that in the vicinity of the accident its fences pass over the culverts and "snug up" to the overpasses in order to seal off the highway. From this evidence, it reasonably may be inferred that the cattle crossed a KDOT fence to get onto State land, and, moreover, it reasonably may be inferred that the cattle crossed the fence where it was down. Testimony that there was no cattle hair on the fence and no cattle tracks where it would be difficult to discern them in the deep grass around the downed fence may weigh against the inference, to some degree, but did not obviate it.

A trial court is required on motions for summary judgment and directed verdict to resolve all facts and inferences to be drawn from the evidence in favor of the party against whom the ruling is sought. Where reasonable minds could reach different conclusions based on the evidence, the motions must be denied. The same rule is applied on review. *Jackson v. U.S.D. 259*, 268 Kan. 319, 322, 995 P.2d 844 (2000); *Reeves v. Carlson*, 266 Kan. 310, 313, 969 P.2d 252 (1998). Thus, the trial court properly found, based upon the

facts and inferences with regard to the cattle, that the cattle left their pasture through the culvert and left Phillips' land for the State-owned land along Highway 69 by crossing the KDOT fence where it was down.

The other question, one which KDOT articulated particularly in its motion for summary judgment, concerns the single cow, not the group of cattle. The evidence shows that the cattle were found on State-owned land on the north side of 259th. The officers and a farmer had cut the KDOT fence in order to herd the cattle from the highway right-of-way onto 259th. Before the cattle could be herded over the 259th Street bridge to a pasture on the east side of the highway, one cow bolted from the group. That cow jumped over a guard rail, jumped a fence, and ran approximately 50 to 100 yards toward the southeast. The officers believed that the single cow was fenced in away from the highway. It reasonably may be inferred from all the evidence that the cow that bolted as it was being herded was the cow that was on the highway and hit by the Reynolds' vehicle. In order to get back to the highway, the cow would have had to recross the KDOT fence, according to the testimony of the officers.

KDOT argued that it was as probable that the single cow reentered the highway right-of-way by jumping a well-maintained KDOT fence as by crossing where the fence was down. KDOT argued that because the cow may have jumped back over the fence to get onto the highway, the evidence does not provide a reasonable basis for concluding that it is more likely than not that its failing to maintain the fence was a cause of the accident.

There is no merit to KDOT's argument. Uncontradicted evidence supports the finding that the cattle got onto the highway right-of-way by crossing the downed fence. Uncontradicted evidence supports the finding that the single cow broke away from the herd while officers were herding them and made its way onto the highway, where it was hit by the Reynolds' vehicle. The persons against whom allegations of negligence were made and to whom the jurors could assign fault were Jones, Arnold Reynolds, and KDOT: Jones for not maintaining the fence across the culvert, Reynolds for not maintaining a proper lookout, and KDOT for not

maintaining its fence. There was no allegation that Reynolds' fault should have cut off any other fault, and there was no other negligence alleged to have contributed to the event after the cattle crossed the KDOT fence onto the highway right-of-way. Thus, as this case was structured by the pleadings, whether the single cow *recrossed* at the downed fence or jumped a well-maintained fence is immaterial. The cattle escaped from private land onto the highway right-of-way due to KDOT's negligence, and before the cattle could be safely confined again, one cow found its way onto the highway and was struck by the Reynolds' vehicle.

In summary, KDOT had a duty to maintain its highways in a reasonably safe condition. The risk of harm did not arise from a remote or unforeseen circumstance of which KDOT had no notice. Reasonable persons could disagree on whether the risk of harm was foreseeable. Thus, whether the risk was foreseeable and the duty breached was a question for the jury. The jury could properly find that KDOT was negligent, and that negligence contributed to the injuries and damages to the Reynolds family.

We reverse the judgment of the Court of Appeals and affirm the judgment of the district court based on the jury verdict.