No. 119,147

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

PATTI MORGAN, Individually and as Natural Mother and Heir-at-Law of
ROBERT DOUGLAS COOK, and the Estate of ROBERT DOUGLAS COOK,
By and Through PATTI MORGAN as Special Administrator of the Estate,
*Appellants*,

v.

HEALING HANDS HOME HEALTH CARE, LLC,
*Appellee*.

SYLLABUS BY THE COURT

1.

A plaintiff may use a statute to establish a duty of care in a simple negligence case even if that statute does not provide a private right of action.

2.

In a simple negligence suit, a plaintiff may use a statute to establish a duty of care and violation of a statutory requirement to establish breach of that duty so long as the injured party was a member of the class the statute sought to protect and the injury was of the character the Legislature sought to protect the public against.

3.

A person need not have been previously declared incompetent, appointed a guardian, or appointed a conservator to qualify as an "adult" within the meaning of K.S.A. 39-1430(a) and K.S.A. 39-1431(a).

1

4.

Under the facts of this case, it was error for the trial court to grant partial summary judgment in favor of defendant home healthcare company in ruling that K.S.A. 39-1431(a) was inapplicable as a matter of law when establishing a duty in a negligence action for the death of a person diagnosed with schizophrenia and diabetes who was receiving twice daily in-home nursing visits from a home healthcare company.

Appeal from Sedgwick District Court; WARREN M. WILBERT, judge. Opinion filed October 11, 2019. Reversed and case remanded for new trial.

*Thomas M. Warner, Jr.*, of Warner Law Offices, P.A., of Wichita, for appellants.

*Stephen H. Netherton* and *Don D. Gribble II*, of Hite, Fanning & Honeyman L.L.P., of Wichita, for appellee.

Before BUSER, P.J., GREEN and MALONE, JJ.

GREEN, J.: Robert Cook had diabetes and "chronic, severe" paranoid schizophrenia, and received twice daily in-home nursing visits from Healing Hands Home Healthcare ("Healing Hands") nurses. He died of hyperthermia in June 2013. After Cook died, his mother Patti Morgan sued Healing Hands for negligence. The trial court granted Healing Hands' partial summary judgment motion, ruling that Kansas' mandatory reporter statute, K.S.A. 39-1431(a), could not serve as a basis for a duty Morgan alleged Healing Hands owed Cook and breached. After a trial, the jury found Healing Hands bore no fault for Cook's death. Morgan now appeals. She argues that the trial court erred by granting Healing Hands' partial summary judgment motion and erroneously failed to give one of her requested jury instructions. For the reasons stated later, we reverse the trial court's partial summary judgment ruling, but we find no error in the trial court's jury instructions ruling.

2

Cook's schizophrenia made him "forgetful" and gave him "daily auditory hallucinations and delusions." Cook was prescribed multiple medications for his condition, including clozapine for his schizophrenia. Clozapine's side effects include increased heart rate and a decreased capacity to tolerate heat. Cook's primary physician ordered that Cook receive home healthcare; Healing Hands was Cook's home healthcare provider. Nurses from Healing Hands were supposed to visit Cook twice every day.

Cook's psychiatrist signed off on a care plan for Cook every two months. The care plans were to be facilitated by Healing Hands. Cook's final care plan was issued on May 27, 2013. The care plan noted that Cook had a potential for "self harm." It stated that Cook "is alert and oriented but forgetful cont[inue]s to be delusional and hallucinate has poor personal hygiene." It listed that for the last 60 days, Cook's vitals were as follows: systolic blood pressure of 100-140; diastolic blood pressure of 62-84; pulse rate of 70-80; respirations of 18-22; and blood sugar ranges between 80 and 220. The pulse rate listed in this care plan did not match Cook's actual pulse readings for the past 60 days.

The care plan ordered that Healing Hands do the following:

- Evaluate Cook's cardiopulmonary status daily.
- Evaluate Cook's eating, hydration, and restroom habits as needed.
- Evaluate for infection as needed.
- Set up Cook's medications weekly and remind him to take them.
- Evaluate Cook's blood sugar on Monday, Wednesday, and Friday.
- Draw labs as needed.
- Evaluate and teach Cook about diabetic diet habits and care.

Beginning on May 20, 2013, Cook's nurses noted that the temperature in Cook's apartment was very warm. The nurses noted the heat, Cook's hygiene, and Cook's continued failure to turn on his air conditioning as follows:

3

- May 20, 2013: "apt. very warm & seems as if client may not use deodorant. Has a potent smell to him."
- May 30, 2013: "Instructed client on personal hygiene."
- June 1, 2013: "house is very warm."
- June 4, 2013: "Pt [patient] very unkempt."
- June 5, 2013 morning: "Instructed client on personal hygiene. . . . Warm in his apt. States he is ok, will turn on A/C later."
- June 5, 2013 evening: "very warm in apt. States he is comfortable."
- June 7, 2013: "Much better hygiene this AM. Not so warm in his apt."
- June 9, 2013: "unkempt odor of pt. house hombly [sic] warm."
- June 11, 2013: "very warm in his apt. States he is ok."
- June 12, 2013: "Strong B.O. Very warm in apt. [Instructed to [increase] fluid intake."
- June 15, 2013: "Apt very warm P.T. [patient] states he's comfortable."
- June 17, 2013: "Talked to client about his apt being so warm. States it's ok for himself."
- June 18, 2013: "Pt very unkept. Strong B.O."
- June 19, 2013: "Very warm in his apartment. States he is fine [with] it."
- June 20, 2013: "Has very poor hygiene, strong body odor. Keeps house very warm. States he is ok, going to take a shower."
- June 21, 2013: "Very warm in apt. States he will use AC later. Informed him about Red Cross giving out fans."
- June 22, 2013: "Pt [patient] appears anxious and house was hot."
- June 23, 2013: "Very warm in his apt. No AC on. Sweating heavily. Poor hygiene. . . . Instructed client about it being so hot. States it's ok."
- June 24, 2013 morning: "Very poor hygiene. Sleeps in his clothes. Client states he is ok with his apt being warm."
- June 24, 2013 evening: "Pt [patient] very unkept. Strong B.O."

4

- June 25, 2013 morning: "Instructed client is not going to use A/C. Sweating heavy. Needs to replenish his fluids. Drink some Gatorade. Very bad body odor. Sleeps in his clothes."
- June 25, 2013 evening: "[Instructed] to [increase] fluid intake to prevent dehydration. Denies being overly warm."
- June 26, 2013 morning: "His apt is very warm inside. He smells really foul. Instructed about heat [and] his sweating. Client states he is comfortable in his apt."
- June 26, 2013 evening: "Pt [patient] very unkept. Strong B.O."
- June 27, 2013 morning: "Very warm in his apt. Not using his A/C. States he's ok. . . . Instructed client it's too warm in here, use you're A/C. States he will later."
- June 27, 2013 evening: "Apt very warm. Pt [patient] states he is comfortable. Discussed drinking Gatorade or similar fluids."

Additionally, while Cook's most recent care plan listed his typical pulse range in the previous 60 days as 70-80 beats per minute, the nurses' notes show that during June 2013, his pulse was significantly higher. The nurses recorded his pulse as follows:

- May 30, 2013. Morning: 119; Evening: 100.
- May 31, 2013. Morning: no visit; Evening: 120.
- June 1, 2013. Morning: 119; Evening: 118.
- June 2, 2013. Morning: 110; Evening: 114.
- June 3, 2013. Morning: 113; Evening: no visit.
- June 4, 2013. Morning: 121; Evening: 123.
- June 5, 2013. Morning: 122; Evening: 109.
- June 6, 2013. Morning: 112; Evening: 117.
- June 7, 2013. Morning: 117; Evening: 106.
- June 8, 2013. Morning: 114; Evening: 118.
- June 9, 2013. Morning: 113; Evening: 117.
- June 10, 2013. Morning: 122; Evening: 116.

5

- June 11, 2013. Morning: 117; Evening: no visit.
- June 12, 2013. Morning: 100; Evening: 133.
- June 13, 2013. Morning: 126; Evening: 118.
- June 14, 2013. Morning: 122; Evening: 106.
- June 15, 2013. Morning: 120; Evening: 112.
- June 16, 2013. Morning: 102: Evening: 109.
- June 17, 2013. Morning: 112; Evening: No pulse listed.
- June 18, 2013. Morning: 117; Evening: 122.
- June 19, 2013. Morning: 113; Evening: 113.
- June 20, 2013. Morning: 126; Evening: No pulse listed.
- June 21, 2013. Morning: 130; Evening: 111.
- June 22, 2013. Morning: 119; Evening: No pulse listed.
- June 23, 2013. Morning: 130; Evening: 114.
- June 24, 2013. Morning: 69; Evening: 114.
- June 25, 2013. Morning: 130; Evening: No pulse listed.
- June 26, 2013. Morning: 125; Evening: No pulse listed.
- June 27, 2013. Morning: 120; Evening: 146.

On the morning of June 27, 2013, however, the pulse listed in Cook's blood pressure log, which is also supposed to be taken by the nurse at the same time, was 150, not 120. According to Debra Mann, the nurse who performed the June 27, 2013 morning visit, this discrepancy is because she did not have her notes with her during the morning visit.

On June 26 and 27, 2013, Sedgwick County, Kansas, was under a heat advisory. On June 26, 2013, the high temperature was 101. On June 27, 2013, the high temperature was 104 and the heat index reached 117 for several hours. Cook died sometime in the night between June 27 and June 28, 2013. Healing Hands' report on Cook's death stated:

"[D]ue to extreme heat and no air client died in night at home, family found him." Cook's death certificate listed "probable hyperthermia" as his cause of death.

After Cook's death, his apartment complex discovered that the air conditioner in his apartment would not have worked even if he turned it on because "the disconnect was removed" and additional parts needed to be replaced.

On June 24, 2015, Morgan brought a wrongful death and survival action against Healing Hands, alleging that Healing Hands' negligence caused Cook's death.

> "To recover for negligence, the plaintiff must prove the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered. Whether a duty exists is a question of law. Whether the duty has been breached is a question of fact." *Reynolds v. Kansas Dept. of Transportation*, 273 Kan. 261, Syl. ¶ 1, 43 P.3d 799 (2002).

*Did the Trial Court Err in Granting Partial Summary Judgment on the Mandatory Reporter Statute?*

On November 1, 2017, Healing Hands moved for partial summary judgment. Healing Hands sought partial summary judgment on two issues: (1) that it legally had no duty to notify Morgan about Cook's condition, and (2) that Kansas' mandatory reporter statute, K.S.A. 39-1431(a), did not require Healing Hands or its employees to report Cook's condition to law enforcement or state authorities.

The relevant portions of K.S.A. 39-1431 read as follows:

> "(a) Any person who is . . . a licensed professional nurse, a licensed practical nurse, . . . [or] the chief administrative officer of a licensed home health agency . . . who has reasonable cause to believe that an adult is being or has been abused, neglected or

exploited or is in need of protective services shall report, immediately from receipt of the information, such information or cause a report of such information to be made in any reasonable manner. . . ."

Under this statute, reports must be made to the Kansas Department for Children and Families or law enforcement. As a result, Morgan is incorrect when she asserts that Healing Hands had a statutory duty to include her in the reporting requirement of K.S.A. 39-1431.

Moreover, it is a class B misdemeanor for a mandatory reporter to fail to make a report when they have reasonable cause to believe an adult is abused, neglected, exploited, or in need of protective services. K.S.A. 39-1431(e).

Healing Hands argued that it had no duty to report under the mandatory reporter statute of K.S.A. 39-1431 because Cook lived independently and managed his own care; he did not have a guardian or conservator, nor did Morgan act as his power of attorney. Further, Healing Hands argued that the information about Cook's apartment and his behavior was readily available to Morgan because she lived in Wichita and could visit and call him.

Healing Hands then argued that the mandatory reporter statute did not apply to the facts of the case because Cook was not an "adult" about whom reporting was mandated within the meaning of the statute.

K.S.A. 39-1430(a) is a stipulative definition regarding the term "adult" within the mandatory reporter statute of K.S.A. 39-1431(a):

"'Adult' means an individual 18 years of age or older alleged to be unable to protect their own interest and who is harmed or threatened with harm through action or inaction by either another individual or through their own action or inaction when (1)

8

such person is residing in such person's own home, the home of a family member or the home of a friend, (2) such person resides in an adult family home as defined in K.S.A. 39-1501 and amendments thereto, or (3) such person is receiving services through a provider of community services and affiliates thereof operated or funded by the department of social and rehabilitation services or the department on aging or a residential facility licensed pursuant to K.S.A. 75-3307b and amendments thereto. Such term shall not include persons to whom K.S.A. 39-1401 et seq. and amendments thereto apply."

Healing Hands argued that Cook was not "alleged to be unable to protect [his] own interests" because there had been no allegations that Cook could not protect his own interests before the events at issue in the suit. Healing Hands contended that in order for the mandated reporter statute to apply, allegations that the adult was unable to protect his or her own interests must come "prior to, or no later than at, the time that a harmful event occurred." Healing Hands reiterated that because Cook lived independently and had no conservator or guardian, he had not previously been alleged to be unable to protect his own interests.

Further, Healing Hands argued that Cook's condition before his death did not render him in need of protective services. K.S.A. 39-1430(f) states, "'[i]n need of protective services' means that an adult is unable to provide for or obtain services which are necessary to maintain physical or mental health or both." Subsection (g) of the same statute states the following:

"'Services which are necessary to maintain physical or mental health or both' include, but are not limited to, the provision of medical care for physical and mental health needs, the relocation of an adult to a facility or institution able to offer such care, assistance in personal hygiene, food, clothing, adequately heated and ventilated shelter, protection from health and safety hazards, protection from maltreatment the result of which includes, but is not limited to, malnutrition, deprivation of necessities or physical punishment and transportation necessary to secure any of the above stated needs, except

9

that this term shall not include taking such person into custody without consent except as provided in this act." K.S.A. 39-1430(g).

Healing Hands argued that Cook was not "unable to provide for or obtain" "adequately . . . ventilated shelter" because he had managed his utilities appropriately while living independently for the past decade. Healing Hands contended that "[t]he reason why Mr. Cook's residence was warm was because Mr. Cook elected not to turn on his air conditioner, despite defendant's nurses telling him to do so."

Morgan opposed Healing Hands' motion for partial summary judgment. First, Morgan clarified that she was not arguing that Healing Hands owed a duty to her. Rather, she argued that one of the "interventions" available to Healing Hands to alleviate the dangerous conditions in Cook's apartment was to call her so that she could intervene, and that failure to utilize this possible intervention constituted part of Healing Hands' breach of its duty to Cook.

Next, Morgan argued that Cook was an adult covered by the mandatory reporter statute of K.S.A. 39-1431(a). She argued that K.S.A. 39-1430 et seq. did not require that an adult first be declared incompetent or appointed a guardian or conservator before they were covered by K.S.A. 39-1431(a).

Morgan also argued that she alleged facts sufficient to establish both neglect and a need for protective services in her pretrial questionnaire wherein she alleged the following:

"Robert was an adult who was harmed or threatened with harm which was mental and physical in nature, through action or inaction of either another individual, in this case agents, employees and officers of Defendant, or through his own action or inaction . . . . By staying in an apartment that was unventilated and extremely hot with an outside heat index of 117 degrees during a dangerous heat advisory that had been disseminated to the

10

public by the National Weather Service, Robert unknowingly put himself at great risk for harm or death."

Finally, Morgan argued that K.S.A. 39-1430 et seq. could serve as a basis for establishing a duty.

The trial court apparently held a hearing on the partial summary judgment motion; no transcript of this hearing appears in the record. The trial court ruled that because Morgan had agreed that Healing Hands owed her no duty, that issue was moot. With respect to the second issue, the trial court ruled that "the defendant in this case, though a mandatory reporter, had no duty to report the decedent's specific circumstances to DCF." The trial court ruled as follows:

> "The evidence does not support the plaintiff s contention that Mr. Cook's situation met the requirements of K.S.A. 39-1430, et. seq., thereby imposing a duty on the defendant to report decedent's living situation to Law Enforcement or DCF. In this case, the hazard for which Mr. Cook was alleged to be in need of protection was his decision to stay in a hot apartment during an unusually hot June. Mr. Cook had no caretaker. He was an adult living independently. Evidence has been provided by both sides that he was capable of taking care of himself and had done so successfully for 16 years prior to his death. He had managed his diabetes, his finances etc. with no assistance. Also, there was no indication that on that day the air conditioning was known by the defendant to be inoperable or that the hot environment was not of Mr. Cook's own choice.
> "Therefore, the Court finds that Mr. Cook's situation did not require the defendant to comply with the mandatory reporting requirements of K.S.A. 39-1431 on June 27, 2013."

On January 23, 2018, a jury trial began. During the trial, Morgan moved for the trial court to reconsider its ruling granting Healing Hands partial summary judgment. She argued that the trial court erred when it stated, "[t]he parties have agreed there is no duty

11

by the Defendant to report to Patti Morgan." Morgan again clarified she asserted that Healing Hands had a duty to call her as part of its duty to Cook. She also argued that "[t]he only reasonable conclusion that can be drawn from the plain, easy to understand language of K.S.A. 39-1430 is that the act covers Robert Cook as he is an 'adult.'" Further, Morgan argued that the trial court's partial summary judgment ruling "did not properly apply the facts of this case to K.S.A. 39-1430 et. seq."

The trial court heard arguments on the motion to reconsider in between testimony from defense witnesses. The trial court and the parties agreed that the earlier order misstated Morgan's argument that Healing Hands should have called her out of a duty of care to Cook. The trial court and the parties agreed that Morgan could still make this argument.

With respect to her second argument, Morgan contended that under the plain meaning of the statute, K.S.A. 39-1430 et seq. applied to the case. Healing Hands argued that it was unfair for Morgan to move for reconsideration so far into trial. On the merits, Healing Hands stated it incorporated all of its arguments from the initial partial summary judgment motion and hearing. The trial court denied Morgan's motion for reconsideration for two reasons. First, the trial court stated that the prejudice caused to Healing Hands by reversing the ruling so late in the trial outweighed the benefits. Second, the trial court stated the following:

> "Because, again, if he was an adult as defined, mandatory—there's no doubt in my mind as a matter of law they're mandatory reporters and they're required. But the context of [the trial court judge who heard the original motion's] ruling is at summary judgment it wasn't demonstrated that he was an adult as defined by the facts of the case, and that's where alleged comes in.
> "So I'm not saying that at some point it could have been proven that he was a mandatory reporter and I'm not saying it could or could not. I'm just saying at this point we need to go forward with the case."

12

After denying Morgan's motion for reconsideration, the trial court heard testimony from Morgan's remaining witnesses and a single defense witness. After both parties' closing statements, the case went to the jury. The jury found that Healing Hands bore no fault for Cook's death. Morgan timely appealed.

On appeal, Morgan argues that the trial court made an error of law by reading requirements into the statute that are not there. Morgan also contends that the trial court erroneously resolved genuine issues of material fact in favor of Healing Hands.

Our standard of review is familiar. Summary judgment may be granted only if no genuine issue of material fact exists:

> ""'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and when we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.'" [Citation omitted.]" *Patterson v. Cowley County, Kansas*, 307 Kan. 616, 621, 413 P.3d 432 (2018).

To the extent that Morgan alleges the trial court "read in" nonstatutory requirements to the mandatory reporter statute, this summary judgment argument is an issue of statutory interpretation. Appellate courts have unlimited review over questions of statutory interpretation. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015). When interpreting statutes, appellate courts first attempt to ascertain the

Legislature's intent through the enacted statutory language, giving common words their ordinary meanings. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016).

*K.S.A. 39-1430*

Chapter 39 of the Kansas Statutes Annotated deals with the social welfare of mentally ill, incapacitated, and dependent persons. Article 14 of this chapter dictates reporting requirements in the event of "abuse, neglect or exploitation of certain persons."

K.S.A. 39-1431(a) identifies the mandatory reporters:

"Any person who is licensed to practice any branch of the healing arts, . . . a licensed professional nurse, a licensed practical nurse, . . . an independent living counselor and the chief administrative officer of a licensed home health agency . . . who has reasonable cause to believe that an adult is being or has been abused, neglected or exploited or is in need of protective services shall report, immediately from receipt of the information, such information or cause a report of such information to be made in any reasonable manner."

K.S.A. 39-1430(a) defines the term "adult" within the mandatory reporter statute of K.S.A. 39-1431(a):

"'Adult' means an individual 18 years of age or older alleged to be unable to protect their own interest and who is harmed or threatened with harm through action or inaction by either another individual or through their own action or inaction when (1) such person is residing in such person's own home, the home of a family member or the home of a friend, (2) such person resides in an adult family home as defined in K.S.A. 39-1501 and amendments thereto, or (3) such person is receiving services through a provider of community services and affiliates thereof operated or funded by the department of social and rehabilitation services or the department on aging or a residential facility licensed pursuant to K.S.A. 75-3307b and amendments thereto. Such

14

term shall not include persons to whom K.S.A. 39-1401 et seq. and amendments thereto apply."

K.S.A. 39-1430(g) is an enlarging definition of the services that are needed to maintain physical or mental health or both of an adult as defined under K.S.A. 39-1430(a):

> "'Services which are necessary to maintain physical or mental health or both' include, but are not limited to, the provision of medical care for physical and mental health needs, the relocation of an adult to a facility or institution able to offer such care, assistance in personal hygiene, food, clothing, adequately heated and ventilated shelter, protection from health and safety hazards, protection from maltreatment the result of which includes, but is not limited to, malnutrition, deprivation of necessities or physical punishment and transportation necessary to secure any of the above stated needs, except that this term shall not include taking such person into custody without consent except as provided in this act."

Healing Hands argued and the trial court agreed that under K.S.A. 39-1430(a), "alleged to be unable to protect their own interest" meant allegations that Cook was unable to protect his own interests must have come "prior to, or no later than at, the time that a harmful event occurred." Healing Hands reiterated that because Cook lived independently and had no conservator or guardian, he had not previously been alleged to be unable to protect his own interests. Healing Hands reiterates those arguments on appeal and argues that the past tense of the word "alleged" means that such allegations must occur before the conduct at the heart of a mandatory report.

On the other hand, Morgan takes issue with this interpretation of the word "alleged." She argues the following: "It is non-sensical to suggest that the Act only applies to those individuals who have been previously determined to be incompetent.

15

Nowhere in the definition section of the Act or anywhere else in the Act does it state this."

First, it is worth noting that K.S.A. 39-1430(a) is a stipulative definition. Stipulative definitions are custom tailored to the particular needs of the document in which they appear. Because a stipulative definition is both complete and exclusive, it must contain all the possibilities in mind. Here, K.S.A. 39-1430(a) is a stipulative definition because it uses the verb "means." See Child, Drafting Legal Documents: Materials and Problems, Stipulative Definitions, p. 237 (1988).

For example, K.S.A. 39-1430(a) states the following:

"'Adult' means an individual 18 years of age or older alleged to be unable to protect their own interest and who is harmed or threatened with harm through action or inaction by either another individual or through their own action or inaction when (1) such person is residing in such person's own home, the home of a family member or the home of a friend, (2) such person resides in an adult family home as defined in K.S.A. 39-1501 and amendments thereto, or (3) such person is receiving services through a provider of community services and affiliates thereof operated or funded by the department of social and rehabilitative services or the department on aging or a residential facility licensed pursuant to K.S.A. 75-3307b and amendments thereto. Such term shall not include persons to whom K.S.A. 39-1401 et seq. and amendments thereto apply."

This stipulative definition gives the term "adult" a particular and a restrictive meaning.

The stipulative definition also sets out what the State would have to allege according to K.S.A. 39-1431(e) to establish a prima facie case against "[a]ny person required to report information or cause a report of information to be made under [K.S.A. 39-1431(a)] who knowingly fails to make such report or cause[s] such report not to be

16

made . . . ." Let us assume that the State wanted to file an action against a mandatory reporter for knowingly failing to report abuse, neglect, or need of protective services information under K.S.A. 39-1431(a). The stipulative definition of the term "adult" under K.S.A. 39-1430(a) would require the State to file a complaint alleging that the adult is an individual 18 years or older who is *alleged* to be unable to protect his or her own interests.

On the other hand, Healing Hands' argument and the trial court's ruling sets up a condition precedent to the State proceeding with a viable action against a mandatory reporter. For example, under Healing Hands' contention and the trial court's ruling, it would require the State to show that Cook was unable to protect his own interests before this "harmful event occurred" to maintain an action under K.S.A. 39-1431. If Healing Hands' and the trial court's interpretation of the term "alleged" in K.S.A. 39-1430(a) is correct, this would mean that all initial mandatory reporters could not be prosecuted under K.S.A. 39-1431(e) for knowingly failing to report abuse, neglect, or need of protective services information unless the State could allege the following: *That the individual is someone who has been alleged to be unable to protect his or her own interests, which occurred before the conduct at the heart of this mandatory report.* We do not believe our Legislature would have enacted such legislation that gives all initial mandatory reporters, to borrow a golf phrase, a mulligan (a free shot to a golfer whose previous shot was poorly played) in situations similar to what we have in this case.

Moreover, the language at issue—"alleged to be unable to protect their own interest" is used in K.S.A. 39-1430(a) to modify the noun phrase "an individual 18 years of age or older." In addition to describing the noun "individual," the word "alleged" also describes the subject *adult* and it completes the meaning of the verb *means*: "an individual 18 years of age or older alleged to be unable to protect their own interest . . . ." (Emphasis added.) A word that is used in this way is called a predicate adjective.

17

Unlike the perfect tenses (*have*, *has*, or *had*), the passive voice sometimes gives no indication of the timing of events. Here, the statutory language in K.S.A. 39-1430(a) does not say much about the timing of events. Nevertheless, the use of the word "alleged*"* as a predicate adjective strongly supports that it refers to events occurring in the future. For example, the United States Supreme Court has stated that past participles "describe the present state of a thing," just the way "adjectives [] describe the present state of the nouns they modify." *Henson v. Santander Consumer USA, Inc.*, 582 U.S. ___, 137 S. Ct. 1718, 1722, 198 L. Ed. 2d 177 (2017). In addition, other courts have concluded that past participles can refer to future events. For example, in *Lang v. United States*, 133 F. 201, 204 (7th Cir. 1904), the court stated that the past participle "begun" in the phrase "prosecution . . . begun under any existing [a]ct" does not "express[] that verb in its past tense." Indeed, the court held it "perform[s] solely the function of a . . . verbal adjective, qualifying any prosecutions in mind, pending or *future*." (Emphasis added.) 133 F. at 204.

K.S.A. 39-1430(a)'s statutory purpose is plainly apparent on its face. It seeks to protect adult individuals, 18 years of age or older, who are "unable to protect their own interest and who [are] harmed or threatened with harm through action or inaction by either another individual or through their own action or inaction . . . ."

We must ask this question: How would Healing Hands' and the trial court's temporal limitation further the statutory objectives of K.S.A. 39-1430(a) and 39-1431(a) and (e)? It would not do so in any way. Moreover, what reason would our Legislature have for silently writing into K.S.A. 39-1430(a) language a temporal distinction with its devastating consequences? Absolutely none.

Finally, another way to ascertain the Legislature's intent when it used the word "alleged" is to look at how the word is used in other portions of the same Act. Alleged appears in two other places in Article 14: K.S.A. 39-1411(b) and K.S.A. 39-1433.

18

K.S.A. 39-1411(b) states:

> "(b) The secretary of health and environment shall forward any finding of abuse, neglect or exploitation alleged to be committed by a provider of services licensed, registered or otherwise authorized to provide services in this state to the appropriate state authority which regulates such provider. The appropriate state regulatory authority, after notice to the alleged perpetrator and a hearing on such matter if requested by the alleged perpetrator, may consider the finding in any disciplinary action taken with respect to the provider of services under the jurisdiction of such authority. The secretary of health and environment may consider the finding of abuse, neglect or exploitation in any licensing action taken with respect to any adult care home or medical care facility under the jurisdiction of the secretary."

It is highly unlikely that the Legislature would have intended the phrase "alleged to be committed by a provider of services" to mean allegations predating those central to the secretary's finding. Thus, we conclude that when the Legislature similarly used the word "alleged" in K.S.A. 39-1430(a), it did not impose a temporal requirement that the allegations that a person was unable to protect his or her own interests must occur before the conduct to be reported. Moreover, we conclude that the trial court committed an error of law when it granted a partial summary judgment to Healing Hands with respect to its interpretation of K.S.A. 39-1430 because Cook had never previously been adjudicated incompetent or appointed a guardian or conservator. The Act itself, by its plain language, imposes no such temporal requirement.

Additionally, Healing Hands argues that the mandatory reporter statute does not apply as a matter of law because only "a subjective belief by the mandated reporter" triggers a duty to report and Healing Hands' nurses did not believe Cook was abused, neglected, or needed protective services. The plain language of K.S.A. 39-1431(a) refutes this argument. It clearly states that any mandatory reporter "who has *reasonable cause to*

19

*believe* that an adult is being or has been abused, neglected or exploited or is in need of protective services shall report, immediately from receipt of the information, such information or cause a report of such information to be made in any reasonable manner." (Emphasis added.) Thus, the duty to report is triggered when a mandatory reporter has "reasonable cause to believe" a covered adult is being abused, neglected, or needs services, not just when a mandatory reporter subjectively believes a report is called for. This is a controverted fact question best left to the jury.

*Genuine Issues of Material Fact*

Morgan contends that "[n]othing in the Act excepts its application simply because there is evidence that the 'Adult' had been able to take care of him or herself earlier in their life." Further, while the trial court ruled that "[e]vidence has been provided by both sides that he was capable of taking care of himself and had done so successfully for 16 years prior to his death[; h]e had managed his diabetes, his finances etc. with no assistance," Morgan contends that these were not uncontroverted facts. Rather, she put forth evidence that Cook was not capable of taking care of himself: "Someone who requires nurses to see him two times a day, 7 days a week, 365 days per year due to his schizophrenia, clozapine use and other medical conditions is not a normal 'adult'." On appeal, Healing Hands still maintains that "the undisputed facts show that Mr. Cook could protect his own interests."

Morgan's argument is compelling. Morgan submitted evidence that Cook had severe schizophrenia since at least 1988, and had an outstanding care plan for twice daily nurse visits to ensure he took his medications, monitor his cardiopulmonary status, and ensure Cook avoided self-harm. The trial court held that it was an uncontroverted fact that Cook was "capable of taking care of himself and had done so successfully for 16 years" and "managed his diabetes, his finances etc. with no assistance." This was, in actuality, a controverted fact because of the evidence Morgan put forward.

20

Healing Hands next argues that even if Cook was an adult within the meaning of the mandatory reporter statute, his circumstances nevertheless did not trigger a duty to report as a matter of law. Healing Hands argues that Cook was not "unable to provide for or obtain . . . adequately heated and ventilated shelter" so as to render him in need of protective services.

Morgan, however, presented evidence controverting Healing Hands' claims on this issue. A repairman for Cook's apartment complex testified that multiple parts on Cook's air conditioner were broken and the unit would not cool air. Additionally, with respect to whether Cook was "unable to provide for or obtain" well-ventilated shelter, Morgan presented evidence about Cook's severe schizophrenia which included delusions and hallucinations. This created a controverted fact as to whether, when his death occurred, Cook could adequately provide for himself.

*Statutes May Serve as the Basis for a Duty of Care Even If They Do Not Include a Private Right of Action*

Healing Hands also argues that the mandatory reporter statute cannot be used to establish a standard of care in a negligence case. Nevertheless, Morgan cites *Shirley v. Glass*, 297 Kan. 888, 308 P.3d 1 (2013), as relevant support for her claim that the mandatory reporter statute can serve as the basis of a duty. In *Shirley*, our Supreme Court held that a statute created a private cause of action, namely, a legal duty. For example, a plaintiff in a negligence action must show four things: duty by the defendant, breach of that duty, causation between the breach and the plaintiff's injury, and damages suffered by the plaintiff. 297 Kan. at 894. In *Shirley*, our Supreme Court held that statutes can serve as a duty in a negligence case so long as the plaintiff is a member of the class the Legislature sought to protect with the statute and the injury is the kind the Legislature sought to prevent. 297 Kan. at 895-97.

21

Healing Hands nevertheless argues that the mandatory reporter statute did not create a duty here as a matter of law because the nurses "did not observe an affected adult with reportable circumstances." As a result, Healing Hands maintains that the *Shirley* holding is distinguishable from this case. We disagree. Healing Hands analogizes this case to *Hackler v. U.S.D. No. 500*, 245 Kan. 295, 777 P.2d 839 (1989). In *Hackler*, a child was hit by a car as he crossed the street to his home after he was dropped off by his school bus on the side of the street opposite his home. His parent sued the school district on his behalf, arguing that a regulation promulgated by the secretary of transportation imposed a duty for the bus driver to require the child to cross the street in front of the bus while the bus was stopped. The trial court granted the school district summary judgment, finding that the school district did not owe the child such a duty. Our Supreme Court affirmed the summary judgment on appeal, finding that any duty arising under this regulation "clearly applies only to those students who must cross the street. So far as the bus driver was aware, none of the children whom she transported crossed [the busy street the child was hit on]." 245 Kan. at 299.

Nevertheless, the *Hackler* holding is distinguishable from this case and the *Shirley* holding. For example, in this case as well as the *Shirley* decision, the statutes involved in those cases clearly defined a duty of care which the defendants owed to the plaintiffs.

In *Shirley*, the plaintiff appealed the trial court's order denying her negligence per se claim. Plaintiff's petition alleged a negligence action against a pawn shop and its owners "based on their act of selling a firearm while knowing that the purchaser intended that another individual would take possession of that firearm and without performing a background check on the intended recipient of the firearm." 297 Kan. at 893. In her answers to interrogatories and her response to the defendant's motion for summary judgment, plaintiff inserted a negligence per se theory, but she was inconsistent in the way she presented that theory: "At times, she presented negligence per se as a statutorily

created private cause of action, but at other times she argued that negligence per se statutorily defines the standard of care in a negligence action." 297 Kan. at 893. Our Supreme Court, however, concluded that plaintiff had not pleaded a negligence per se claim as a separate cause of action created by statute but, instead, she was alleging only a claim of "simple negligence." 297 Kan. at 894. Thus, in actuality, she was relying on federal and Kansas statutes prohibiting the distribution of firearms to felons to define the standard of care.

As a result, our Supreme Court held that it was "irrelevant" whether the statutes gave rise to a private cause of action since the statutory violation was not the basis for her claim. 297 Kan. at 894. Our Supreme Court then focused on whether plaintiff could use the firearm-transfer statutes to establish a duty of care in a negligence action. The court ultimately concluded that she could under the facts of her case. 297 Kan. at 895-97.

In so holding, our Supreme Court considered if the firearm-transfer statutes were "intend[ed] to protect the class [of persons], even if it includes all members of society, from a particular kind of harm." 297 Kan. at 896. In answering this question in the affirmative, the court concluded that "the Kansas statute prohibiting the sale of firearms to certain convicted felons is intended to protect the citizens of this state from violent crimes committed by those felons." 297 Kan. at 897. As a result, the court held that plaintiff could use the violation of the firearm-transfer statutes to establish a duty and breach of duty to support her negligence claim. 297 Kan. at 897.

Applying the *Shirley* holding to this case, we must consider if the purpose of K.S.A. 39-1430 and K.S.A. 39-1431 includes protecting Cook and other persons like him from a particular kind of harm. Under K.S.A. 39-1430(a), there is a clear legislative intent to promote the prevention of abuse of individuals who are "unable to protect their own interest . . . through action or inaction by either another individual or through their own action or inaction . . . ." To achieve this purpose, the Kansas Legislature has created

23

both mandatory and permissive reporting of suspected cases of abuse to the proper authorities. K.S.A. 39-1431. Moreover, in the event of a report by a mandatory reporter, "[no] employer shall terminate the employment of . . . any employee solely for the reason that such employee made or caused to be made a report." under K.S.A. 39-1432(b).

Here, as Morgan argues in her brief, Cook was "tailor made for the mandatory reporting statute." For example, Cook was cared for in his home by registered and licensed practical nurses. Moreover, Cook was vulnerable because of his severe mental illness. And he died from hyperthermia because of a lack of ventilation in his home during a dangerous heat wave. Evidence showed that Cook neglected his hygiene and his physical and mental health because of his severe mental illness. As a result, Cook needed proper care services to maintain his physical and mental health. Thus, we conclude that Cook belonged to a class of members that K.S.A. 39-1430 and K.S.A. 39-1431 intended to protect. As a result, we hold that these statutes established a duty of care and the violation of these statutes may be used by Morgan to establish a breach of duty.

Finally, Healing Hands argues that the mandatory reporter statute cannot serve as the basis of a duty because the similar mandatory child abuse reporter statute does not provide a private right of action. This is unpersuasive. As explained earlier, our Supreme Court noted in *Shirley* that there is a difference between a private right of action created by a statute and the use of a statute to establish a duty in a simple negligence case like the one here. *Shirley*, 297 Kan. at 894 ("Whether these statutes give rise to an independent private cause of action is irrelevant in the present case, however, because Shirley did not plead a statutory violation as the grounds for her suit. She instead presented a case based on simple negligence.").

We reverse the trial court's partial summary judgment ruling because it erroneously ruled that it was an uncontroverted fact that Cook could care for himself, and because it made an error of law by ruling that Cook must have been previously alleged to

24

be incompetent in order for the mandatory reporter statute to apply. We therefore remand for a new trial where Morgan can argue that K.S.A. 39-1430 et seq. can serve as the basis of Healing Hands' duty.

*Did the Trial Court Err by Declining to Instruct the Jury on Healing Hands' Duty?*

The trial court held its instruction conference after both parties rested. Morgan submitted her first amended set of jury instructions. One of her proposed instructions was derived from PIK Civ. 4th 123.02, which reads:

"A hospital's duty to a patient is to use the degree of reasonable care required by that patient's known physical and mental condition. On medical or scientific matters, a hospital's standard of reasonable care is the same care, skill, and diligence used by hospitals in the same or similar communities and circumstances. A violation of this duty is negligence."

Morgan's proposed instruction read:

"A home health care provider's duty to a patient is to use the degree of reasonable care required by that patient's known physical and mental condition. On medical or scientific matters, a home health care provider's standard of reasonable care is the same care, skill, and diligence used by home health care provider's [*sic*] in the same or similar circumstances. A violation of this duty is negligence."

Morgan stated that the instruction was proper because "we have to instruct on the duty of the principal and we have to instruct on the duty of the agent." Healing Hands opposed the instruction, arguing that the court addressed an agency relationship in a separate instruction and that 123.02 refers to hospitals, nursing homes, and other inpatient care facilities, not home healthcare agencies. The trial court excluded the proposed

25

instruction, and Morgan objected. Morgan also objected again to the trial court's exclusion of an instruction on K.S.A. 39-1430 et seq.

Appellate courts address jury instruction challenges using a four-step process as follows:

"'For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011) . . . .' [Citation omitted.]

"In addressing an instructional error, an appellate court examines "'jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law or whether it is reasonable to conclude that they could have misled the jury."' *State v. Hilt*, 299 Kan. 176, 184, 322 P.3d 367 (2014) (quoting *State v. Williams*, 42 Kan. App. 2d 725, Syl. ¶ 1, 216 P.3d 707 [2009] )." *Biglow v. Eidenberg*, 308 Kan. 873, 880-81, 424 P.3d 515 (2018).

Morgan contends that the trial court's failure to give her requested instruction was error. Below, Morgan argued that "we have to instruct on the duty of the principal and we have to instruct on the duty of the agent." Healing Hands opposed the instruction, arguing that the court addressed an agency relationship in a separate instruction and that 123.02 refers to hospitals, nursing homes, and other inpatient care facilities, not home healthcare agencies. The trial court excluded the proposed instruction and Morgan objected.

On appeal, Morgan argues that by failing to give her proposed instruction on a home healthcare agency's duty, the trial court failed to properly instruct the jury on her theory of the case. She further argues that this was likely confusing to the jury because

> "[t]he trial was about the Defendant's breach of its duty to provide the degree of care required by Robert Cook's known physical and mental condition. But, when it came time to instruct the jury on the law as it applied to the Defendant, all they received was the instruction on a nurse's duty of care."

Finally, she argues that "the jury was not instructed that Robert Cook's known physical and mental condition drives the standard of care."

On appeal, Healing Hands argues that clear error review applies because Morgan raises different arguments on appeal than she did below. See *State v. Ellmaker,* 289 Kan. 1132, 1138-39, 221 P.3d 1105 (2009) (applying clear error analysis when party objects to instruction on one ground at trial but separate ground on appeal). Clear error analysis would apply to any arguments beyond the scope of what Morgan argued below. Nevertheless, here, Morgan consistently argued below and on appeal that the requested instruction was necessary because the jury needed to be instructed about both a nurse's duty and a home healthcare agency's duty. We disagree because Morgan's petition and pretrial conference questionnaire lacked any independent claim of Healing Hands' negligence except vicairously through the negligence of its nurses. As a result, Morgan's sole theory of recovery against Healing Hands was based on a respondeat superior claim. The trial court gave the jury a respondeat superior instruction. Thus, we conclude that there was no error committed in the trial court's instructions to the jury.

Assuming for sake of argument that the instruction was legally and factually appropriate, Healing Hands convincingly demonstrates that any error was harmless. Under *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011), the appropriate harmless

27

error test for nonconstitutional errors, like the one here, is whether there is a "reasonable probability that the error did or will affect the outcome of the trial in light of the entire record." 292 Kan. 541, Syl. ¶ 6.

Morgan makes much of the trial court's failure to instruct on a separate standard of care for a home healthcare agency, but in a different instruction given to the jury, the trial court stated:

> "Healing Hands Home Health Care, LLC is responsible for any negligent act or omission of its employees, Lori Ford, Debra Mann, Rebecca Baca and Francis Smith.
> "If you find Lori Ford, Debra Mann, Rebecca Baca or Francis Smith was negligent, then you must find that the defendant Healing Hands Home Health Care, LLC was negligent.
> "But if you find Lori Ford, Debra Mann, Rebecca Baca and Francis Smith were not negligent, then you must find that the defendant Healing Hands Home Health Care, LLC was not negligent."

Here, the trial court expressly conflated Healing Hands' negligence with that of the nurses and stated that if the jury did not find the nurses were negligent, it could not find that Healing Hands was negligent. Morgan did not object to this instruction. Indeed, Morgan's proposed jury instructions included two instructions similarly conflating Healing Hands' negligence with that of its nurses.

Because Morgan assented to the trial court's express conflation of Healing Hands' negligence with that of its employees, any error in the failure to give Morgan's proposed instruction above was harmless. Thus, the trial court did not commit reversible error by declining to give the requested instruction.

Reversed and case remanded for a new trial.

28

\* \* \*

MALONE, J., concurring:  I concur in the result.

\* \* \*